In re MONEX CORPORATION, a Florida corporation, Debtor.

WALTER E. HELLER & COMPANY SOUTHEAST, INC., Plaintiff,

v.

MONEX CORPORATION, a Florida corporation and Harold D. Moorefield, as Trustee, Defendants.

Bankruptcy No. 82–01184–BKC–JAG.
Adv. No. 82–0949–BKC–JAG–A.

United States Bankruptcy Court,
S.D. Florida.

May 20, 1983.

John L. Britton, Fort Lauderdale, Fla., for Heller.

Harold Moorefield, Jr., Miami, Fla., trustee.

## FINDINGS AND CONCLUSIONS

JOSEPH A. GASSEN, Bankruptcy Judge.

THIS MATTER was tried on a Complaint to determine the validity, priority and extent of Plaintiff's, Walter E. Heller & Company Southeast, Inc. ("Heller") lien and interest in accounts receivable of the debtor. Heller had taken possession of the debtor's personal property and accounts receivable as a result of a voluntary surrender of collateral to Heller prior to bankruptcy. Heller brought this adversary seeking de-termination that the Trustee has no interest in the assets and also seeking authorization to collect the remaining accounts receivable directly from the account debtors.

The Trustee counterclaimed for the equitable subordination of Heller's claim, alleging that any lien of Heller should be transferred to the estate and that all of the debtor's assets held by Heller be turned over to the Trustee. The Trustee also sought to avoid the transfer as a preference under § 546 or § 547(c); however, the Trustee withdrew his preference claim at trial.

The Court concludes that Heller has a valid, first priority lien on all the assets of the debtor and that the Trustee has no interest in either the personal property which has been voluntarily turned over to Heller, or any interest in the accounts receivable of the debtor.

Except for the period during which Singer-Friedlander became principal lender as discussed below, Heller has been the principal commercial lender for the debtor since approximately 1972. Heller made various loans and advances to the debtor to the extent of 2.5 million dollars, for which Heller was granted a continuing security interest in virtually all of the debtor's assets. In addition, Heller held the continuing personal guaranty of Milton Perlman, principal stockholder of the debtor. That guaranty was collateralized by mortgages on real property owned by Perlman and occupied by the debtor as its business premises.

In June 1982, the debtor defaulted under the terms of the financing agreement between the parties. The debtor turned over all of its personal property and accounts receivable to Heller to satisfy the debt. Heller then sold the assets at a public auction for $500,000.00. It was Perlman who ultimately purchased the assets (through a financing arrangement with Heller) and formed a new corporation known as Metal Studds, Inc., a company which is presently operating at the debtor's former business premises. An involuntary petition in bankruptcy was filed against the debtor in July of 1982.

In the course of his examination of the books and records of the debtor, the Trustee found a series of transactions and events relating to the internal financial affairs of the debtor, some of which involved Heller and which appeared to be especially advantageous to Heller in its position as primary lender. In June of 1980, for example, a joint venture agreement known as Monex Company was executed between the debtor and its stockholder Perlman, pursuant to which the debtor contributed all of its assets to the joint venture and Perlman conveyed his real property, valued at approximately $2,000,000.00. Shortly thereafter, the debtor received a 2.5 million dollar loan from Singer-Friedlander, a London mercantile bank, at a relatively low rate of interest. The Note was guaranteed by Heller, who was paid a fee to service the loan and who continued to maintain its security interest in all of the debtor's assets. New security agreements were executed between Heller and Monex Company, all of which were perfected by Heller, assuring Heller of a continuing lien on assets of the debtor and of the newly created entity. In November, 1981, the joint venture agreement was terminated; assets were transferred back to the debtor corporation and to Perlman respectively, leaving the debtor with a negative balance sheet. In February, 1982, the Singer-Friedlander Note was satisfied by a new loan to the debtor from Heller in the amount of 2.5 million dollars, Heller continuing to be collateralized by the assets of the debtor and of Perlman. From that chain of events, followed by the surrender of assets to Heller upon the debtor's insolvency and the subsequent repurchase by Perlman of those assets to formulate a new company also financed by Heller, the Trustee drew the conclusion that Heller, as a secured lender, dominated and in fact controlled the debtor so as to bring about the liquidation of the debtor to its own best advantage and at the expense of general unsecured creditors. The Trustee alleged that Heller's actions in manipulating the debtor's financial affairs to its own benefit constituted misconduct sufficient to invoke the doctrine of equitable subordination, requiring Heller to subordinate its lien to the claims of all other creditors of the estate.

The Court finds from the evidence and testimony that despite the appearance of non-arm's length transactions in a rather unusual sequence of events, Heller did not act improperly in its business dealings with the debtor and, therefore, no justification exists for the subordination of Heller's lien. First, the evidence established that Heller did not participate in the formation of the joint venture agreement known as Monex Company. Heller did not even become aware of the existence of the joint venture agreement until several months after the fact. The formation of Monex Company was strictly an internal transaction on the debtor's books of account. Furthermore, it is clear that Heller did not initiate or negotiate the foreign loan. Heller rather accommodated the debtor by agreeing to guaranty and service the loan, so long as Heller continued to be fully secured. In all likelihood, the loan transaction with the London bank could not have occurred without Heller's guaranty. Heller reexecuted documents and reperfected its security interest in collateral as soon as it learned of the formation of the joint venture. In so doing, however, Heller was acting to protect its secured position vis a vis all its collateral. The evidence reflects, in fact, that if Heller had had any degree of control over the debtor, it might have attempted to prevent any such joint venture agreement from being formed.

The Court concludes that Heller did not have any control or undue influence over the financial affairs of the debtor nor was Heller's conduct anything other than that of a prudent secured lender with 2.5 million dollars at risk. Nor is there any showing that the voluntary surrender of collateral to Heller and subsequent sale of assets by Heller was accomplished other than in full compliance with state law.

The Trustee argues that even if Heller did not control the debtor's affairs, nevertheless, when the joint venture was formed, the total assets of the joint venture, including Perlman's real property,

came within the reach of creditors of the debtor. The Trustee contends that the termination of the joint venture agreement and the reconveyance of that property back to Perlman wrongfully cut off rights of creditors of the debtor in that valuable asset. The Trustee urges that the equity in that property be brought into the estate by way of a marshalling theory.

However, the debtor's creditors did not receive notice of the joint venture agreement, nor did they ever do any business with the "Monex Company." That entity was nothing more than an internal accounting device, formed to attract more favorable financing for the corporation and terminated in a year's time because it did not accomplish its intended purpose. The real property owned by Perlman has always served to secure Heller's loans; no other creditor of the debtor had ever relied on that property as an asset of the debtor. Hence, the reconveyance of the property to Perlman at the termination of the joint venture agreement did not alter the position of the debtor's creditors. Any opportunity to reach that asset in bankruptcy would give unwarranted advantage to unsecured creditors of the debtor and would unjustly interfere with Heller's rights as holder of a first priority lien on the debtor's assets. The Court therefore concludes that no creditors having been injured by conduct of Heller, no justification exists for the reordering of priorities for the distribution of assets by application of equitable subordination or by any other equitable doctrine.

The Court finds and concludes that Heller has a first position lien on all the assets of the debtor, that the Trustee has no interest in either the personal property which has been turned over to Heller or any interest in the accounts receivable. Heller is therefore authorized to collect the accounts receivable directly from the remaining account debtors. This decision is without prejudice to the rights of the Trustee or any other interested party to bring any action which he may deem appropriate against Mr. Perlman individually.

The Court commends the Trustee for his alertness in discovering the transactions giving rise to this controversy and also for the competent manner in which he has pursued the matter. Although under these facts and circumstances, the Court has found for Heller, this decision in no way diminishes the importance of the Trustee's function nor the fact that the job was done well in this instance.

Pursuant to Rule 921(a), a separate final judgment incorporating these Findings and Conclusions is being entered this date.