**In re SEPCO, INC., Debtor.**

**SEPCO, INC., Plaintiff,**

v.

**VALLEY STATE BANK; United States of America, Farmers Home Administration; Vicky Kindt Clites; Coast to Coast Store of Scotland, Sd; Pecaut Equipment Co.; James Mehlhaff; Jensen Steel & Pipe; Gas Services, Inc.; Lehr Well Drilling; Dan Dugan Transport Co.; Northwestern Supply Company; Arlon Industries, Inc.; Larry Auch, dba Auch Plumbing & Heating; Helmuth Fischer, dba Fischer Electric; Richard M. Hall, dba Rich's Electric; Cargill, Inc.; and United States of America, Internal Revenue Service, Defendants.**

Bankruptcy No. 483–00070.
Adv. No. 483–0101.

United States Bankruptcy Court,
D. South Dakota.

Jan. 6, 1984.

John C. Quaintance, Quaintance, Swanson & Johnson, Sioux Falls, S.D., and Craig A.

Kennedy, Doyle, Bierle, Porter & Kennedy, Yankton, S.D., for plaintiff.

William J. Klimisch, Yankton, S.D., for Valley State Bank.

Robert J. Haar, Asst. U.S. Atty., Sioux Falls, S.D., for U.S.A., FmHA.

## MEMORANDUM DECISION

PEDER K. ECKER, Bankruptcy Judge.

### PROCEDURAL HISTORY

Sepco, Inc. (debtor), filed a complaint to determine the validity, priority, and extent of liens in the above-entitled chapter 11 bankruptcy on March 29, 1983. Seventeen defendants were served with the complaint, including the Valley State Bank of Yankton, South Dakota (bank), and Arlon Industries, Inc. (Arlon). Arlon answered and cross-claimed against all other defendants for a determination that its mechanic's lien was superior to any other encumbrances against the alcohol production plant and related real property belonging to the debtor. Eventually, all the conflicts among the various parties were settled through stipulation or default except the priority dispute between Arlon and the bank.[1] Consequently, the Court held a trial on August 15, 1983, to determine the relative lien priority of the lien interests of Arlon and the bank. Following the trial, the Court took the matter under advisement with respective counsel given an opportunity to submit briefs to the Court.

### THE FACTS

The debtor corporation was created for the sole purpose of building and operating an alcohol production plant in Scotland, South Dakota. The debtor first contacted Arlon in October of 1979 regarding the purchase of some distillation columns for the proposed plant. Thereafter, the parties continued an ongoing relationship with Arlon providing material and labor with the

---

1. The priority of liens between the bank and Arlon has important financial consequences be- cause the value of the collateral securing the liens is not nearly enough to pay both liens.

eventual goal of completing an operating alcohol production plant.

Without notice of the bank's participation in the alcohol plant, Arlon began supplying work and material at the building site in mid-February of 1980. In June of 1980, the debtor and Arlon entered into a cost-plus-ten-per-cent agreement for materials and an across-the-board labor charge of $15.00 per hour for all labor including both salaried positions and wage positions. Arlon continued to supply labor and materials at the debtor's building site until May 16, 1981.

Arlon, with the assistance and cooperation of the debtor, prepared a mechanic's lien statement reflecting the labor and materials it supplied to the debtor for the construction of the alcohol plant between February 11, 1980, and May 16, 1981. The mechanic's lien statement was duly filed with the Bon Homme County Register of Deeds on May 18, 1981, two days after Arlon provided the last labor and material to the debtor.

The bank financed the construction of the alcohol plant. To secure its position, the bank filed a mortgage on the real property where the plant was located in November of 1980 and obtained a security agreement covering tools, furniture, and fixtures and filed a related financing statement with the Bon Homme County Register of Deeds and the Secretary of State on June 13, 1980. A considerable time after the bank began advancing funds to the debtor, the bank sought and received a ninety per cent (90%) Farmers Home Administration (FmHA) loan guarantee for the funds extended to the debtor.[2]

Some time after the bank began advancing funds to the debtor, the bank's owners became concerned with the bank's secured position and sent David Dexter, Vice President and Senior Trust Officer for the affiliate Valley National Bank of Sioux Falls, to Yankton to review the debtor's loan file. After examining the file, Dexter, who has been employed in the banking business for over twenty-three years, drafted a memo dated June 19, 1980, to the Yankton bank outlining various suggestions that needed to be implemented to enable the bank to shoreup its secured position on the loans made to the debtor. That memo closes with the following reminder: "The key to this loan is the guarantee by the FmHA and for that reason it is essential that all conditions are complied with."

Dexter's testimony on cross-examination at the August 15 trial reveals that the bank had already advanced $275,000. to the debtor by June of 1980 and confirms that the primary reason behind Dexter's review of the debtor's loan file was the necessity of obtaining an FmHA ninety-per-cent loan guarantee. Also, after reviewing the loan file, Dexter concluded that absent lien waivers or a subordination agreement from Arlon, the bank's lien position was inferior to Arlon's mechanic's lien.

Without as much as contacting the debtor, Dexter journeyed to Arlon's headquarters in Sheldon, Iowa, on July 16, 1980. At that time, he met with David Vander Griend, the President of Arlon, and Deb Vander Griend, who did Arlon's bookkeeping. During the meeting, Dexter produced a one-page typewritten document entitled, "Offer of Sale," which recited prior sales and payments between the debtor and Arlon. Buried in the middle of the so-called "Offer of Sale" is the following language: ". . . or if any liens attach on such property to the benefit of the SELLER, the SELLER agrees that any such liens will be subordinate and junior to other liens held on the property by Valley State Bank of Yankton, South Dakota, and the Farmers Home Administration of Huron, South Dakota." Arlon's president signed the agreement.

The "Offer of Sale" was drafted by one of the bank's owners who is also a practicing lawyer. Although there is some dispute, David and Deb Vander Griend both testified that Dexter represented to them

2. FmHA's interests are tied to the bank's position and priority as the FmHA guaranteed the loan as made by the bank.

that if they signed the document, they would be assured payment of the amounts that the debtor owed Arlon. David Vander Griend signed the document relying on Dexter's representations. Arlon, however, with the exception of several items exempted by the terms of the "Offer of Sale," never received any payments subsequent to signing the document. Arlon's sole contact with the bank occurred July 16, 1980, the date its president signed the document. Dexter did not disclose the existence of the lien subordination clause; did not explain the consequences of signing the document to Arlon's representatives; did not give Arlon's representatives a copy of the document; and the document was never discussed between Arlon and the debtor. Moreover, except for the items specifically excluded from the sales agreement, the bank failed to take any steps to assure that the debtor's obligations to Arlon were paid.

Dexter admitted that the "Offer of Sale" looked considerably different from any standard form lien waiver with which he was familiar. In fact, Dexter agreed that he had not seen a document like it in his twenty-three years in the banking business. Dexter further conceded that it was highly unusual for a bank to unilaterally draft contracts for third persons. Moreover, he had great difficulty explaining how the "Offer of Sale" document benefited anybody other than the bank.

### THE ISSUES

This proceeding presents three issues for resolution:

(1) Whether the mechanic's lien filed by Arlon is invalid because of alleged failures to comply with various requirements of S.D. C.L. Chapter 44–9;

(2) Whether the subordination agreement signed by Arlon is enforceable under 11 U.S.C. § 510(a); and

(3) Whether the allowed claim of the bank should be equitably subordinated in accordance with 11 U.S.C. § 510(c) and related case law.

### *The Validity of Arlon's Mechanic's Lien*

The bank argues that Arlon's mechanic's lien is invalid for three reasons: (1) Arlon did not file within the statutory 120-day period required by S.D.C.L. § 44–9–15 (1983); [3] (2) that Arlon's mechanic's lien is invalid because it contains willful misstatements; and (3) the amounts charged under the lien for labor are not reasonable as to the bank under S.D.C.L. § 44–9–6 (1983).[4] A close examination of the bank's arguments, however, clearly shows that they lack merit.

■ Although it is not proper to tack several separate contracts together to extend the time to file a mechanic's lien pursuant to S.D.C.L. § 44–9–15 (1983) where the process of construction and delivery of items is reasonably continuous, a single lien statement may be made to include all items contributing to the continuous transaction. *Botsford Lumber Co. v. Schriver,* 49 S.D. 68, 206 N.W. 423, 426 (1925); *Big Sioux Lumber Co. v. Miller,* 57 S.D. 506, 234 N.W. 31, 34 (1930); *Wefel v. Harold J. Westin & Assoc., Inc.,* 329 N.W.2d 624, 626–28 (S.D. 1983). The evidence in this proceeding indicates that Arlon supplied labor and materials as part of one reasonably continuous and

---

3. S.D.C.L. § 44–9–15 (1983) provides:
The lien shall cease at the end of one hundred twenty days after doing the last of such work, or furnishing the last item of such skill, services, material, or machinery, unless within such period a statement of the claim therefor be filed with the register of deeds of the county in which the improved premises are situated, or of the county to which such county is attached for judicial purposes, or if the claim be under the provisions of subdivision (2) of § 44–9–1, with the secretary of state.

4. S.D.C.L. § 44–9–6 (1983) provides:
If the contribution be made under a contract with the owner and for an agreed price, the lien as against him shall be for the sum so agreed upon together with the cost of any additional material or work agreed upon, otherwise, and in all cases as against others than the owner, it shall be for the reasonable value of the work done, and of the skill, material, and machinery furnished.

connected transaction which began on February 11, 1980, and concluded on May 16, 1981. It is undisputed that Arlon's lien statement was filed on May 18, 1981, which is well within one hundred twenty (120) days of May 16, 1981, the last day that Arlon furnished labor or material. *See* S.D. C.L. § 44–9–15 (1983). Consequently, Arlon's lien was timely filed. Moreover, because Arlon's lien attaches and takes effect from the time the first item of material and labor was furnished upon the premises, February 11, 1980, it is obviously superior to the mortgage filed by the bank in November, 1980, and the security interest in equipment and fixtures perfected by a financing statement filed on June 13, 1980. *See* S.D. C.L. §§ 44–9–7, 44–9–1 (1983).[5]

■ The bank insists that Arlon's lien is invalid because Arlon willfully misstated the date it actually began providing labor and material on the debtor's premises and because it impermissibly includes labor costs for management employees who performed no actual manual labor. Arlon's mechanic's lien statement lists February 11, 1980, as the first date that labor and material were provided on the premises. The record supports this date, and, even if the

first day that labor and services were provided was not until sometime in May of 1980, Arlon's lien is prior to the bank's mortgage which was not filed until November of 1980. In addition, there is nothing in the record showing that Arlon intentionally and knowingly falsified its lien statement as to the time of filing or amount and, therefore, its lien should not be forfeited. *Wittrock v. Hall,* 51 S.D. 39, 211 N.W. 801 (1927).

■ As to the bank's claim that labor charges in Arlon's lien statement improperly include management salaries, in South Dakota, the costs associated with employees who perform both manual labor and management functions merge into one indivisible employment which brings the whole service within the contemplation of the mechanic's lien. *Hahn v. Anaconda Gold Mining Co.,* 26 S.D. 218, 128 N.W. 128, 129 (1910). At the trial, David Vander Griend, Arlon's President, indicated that all management employees performed at least some manual labor. Even if this were not so, the Court would be inclined to accept management costs performed exclusively on the job as amounts contemplated under S.D.

---

**5.** S.D.C.L. § 44–9–7 (1983) provides:
Such lien as against the owner of the property shall attach and take effect from the time the first item of material or labor is furnished upon the premises by the lien claimant, and shall be preferred to any mortgage or other *encumbrance not then of record,* unless the lien holder had actual notice thereof.
S.D.C.L. § 44–9–1 (1983) provides:
Whoever shall, at the request of the owner or the duly authorized agent or representative of the owner, or of any contractor or subcontractor, furnish skill, labor, services, including light, power, or water, equipment, or materials for the improvement, development, or operation of property as hereinafter specified, shall have a first lien thereon and the appurtenances thereto, prior and superior to all other liens except those of the state or of the United States, and except existing liens, mortgages, or other encumbrances then of record or of which the lien claimant has actual notice, for the price or value of the same, so furnished, subject to the further provisions of this chapter, as follows:
(1) For the erection, alteration, repair, or removal of any building, fixture, bridge, fence, or other structure or for grading, filling

in, or excavating the same, or for digging or repairing any ditch, drain, well, cistern, reservoir, or vault thereon or for laying, altering, or repairing any sidewalk, curb, gutter, paving, sewer, pipe, or conduit in or upon the same or in or upon which the property abuts, a lien upon the *said improvement and the* land on which it is situated, or to which it may be removed;
(2) For the construction, alteration, or repair of any line of railway or of any telegraph, telephone, electric light, or power line, or of any line of pipe, conduit, or subway or any structure, appliance, or fixture upon or appertaining to any of them, a lien upon the public utility so constructed, altered, or repaired and upon the line, plants, and property thereof and upon all the rights, franchises, and privileges of the owner appertaining thereto;
(3) Upon any mine or mining claim, oil or gas well or spring, a lien upon the same and any rights, privileges, franchises, easements, and tangible property and other property or appliances appurtenant thereto, for any of the items hereinbefore specified or referred to as giving right to a lien.

C.L. § 44–9–1 (1983) as labor for improvement, development, or operation of property.

■ Finally, there is nothing in the record which renders Arlon's flat $15.00 per hour across-the-board labor charge unreasonable or excessive as against the bank. Arlon had a number of laborers on the job making between $5.50—$6.00 per hour, but they also had several salaried employees who were being paid considerably more than that. After a review of all the testimony and exhibits, the Court is unwilling to conclude that the $15.00 per hour rate is an unreasonable value to be placed on the total labor package. *See* S.D.C.L. § 44–9–6 (1983).

### Subordination Agreements and Equitable Subordination Under the Code

Section 510(a)[6] of the new Bankruptcy Code provides that subordination agreements are enforceable in bankruptcy to the same extent that they are enforceable under applicable nonbankruptcy law. Applicable nonbankruptcy law is the law of contracts. A subordination agreement is nothing more than a contract where one party agrees to subordinate his claim against a debtor in favor of the claim of another creditor.

Arlon raises four state law defenses against the enforcement of the subordination agreement found in the "Offer of Sale" document signed by Arlon's President on July 16, 1980, at the request of the bank's agent, David Dexter. Arlon alleges that the subordination agreement is unenforceable because it was procured by fraud; that the bank should be estopped from benefiting from its inequitable conduct; that there is a failure of consideration; and, finally, that the bank would be unjustly enriched if it were allowed to enforce the subordination agreement against Arlon. The Court has carefully examined the four defenses raised by Arlon in the light of all the evidence and concludes that the bank is precluded from enforcing the subordination agreement under each of the four theories advanced by Arlon.

S.D.C.L. § 53–4–5 (1980) prescribes the elements of fraud in relation to contracts as follows:

Actual fraud in relation to contracts consists of any of the following acts committed by a party to the contract, or with his connivance, with intent to deceive another party thereto or to induce him to enter into the contract:

(1) The suggestion as a fact of that which is not true by one who does not believe it to be true;

(2) The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believe it to be true;

(3) The suppression of that which is true by one having knowledge or belief of the fact;

(4) A promise made without any intention of performing it; or

(5) Any other act fitted to deceive.

Actual fraud is always a question of fact. The bank is a party to the subordination agreement. This is true although they did not sign the document. One of the owners of the bank drafted the deceptive document entitled, "Offer of Sale," which contained a subordination clause buried in the middle. The bank's experienced loan officer took the document to Arlon's headquarters without first consulting with the debtor and subsequent to discovering that Arlon's mechanic's lien had priority over the bank's mortgage and security interest. Dexter did not disclose the existence of the subordination clause or the clause's effect to Arlon's representatives. Moreover, the bank desired an FmHA guarantee of their loan to the debtor. Realizing that the debtor owed considerable sums to Arlon and that Arlon obviously was eager to obtain payment,

---

**6.** "A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."

11 U.S.C. § 510(a).

Dexter represented that if Arlon signed the document, the bank would assure payment of the sums due Arlon. Arlon's representatives knew that the debtor's source of funds was the bank and, consequently, signed the document relying on Dexter's representations. At the time, Dexter never really intended that the bank would pay Arlon but only desired lien priority over them. Thereafter, Arlon never received any payments from or at the request of the bank.

■ Surely, these facts clearly establish the suppression of that which is true by one having knowledge or belief of the fact and the making of a promise without any intention of performing it. Based on this record, the Court concludes that Arlon has established fraud by clear and convincing evidence; and, therefore, the subordination agreement is rescinded and unenforceable against Arlon. *Winter v. Johnson,* 27 S.D. 512, 131 N.W. 1020 (1911); *Grewing v. Minneapolis Threshing Machine Co.,* 12 S.D. 127, 80 N.W. 176 (1899).

■ In South Dakota, the elements of equitable estoppel are: (1) false representations or concealment of material facts must exist; (2) the party to whom it was made must be without knowledge of the real facts; (3) the representations or concealments must have been made with the intent that they should be acted upon; (4) and the party to whom it was made must have relied thereon to his prejudice or injury. *Cromwell v. Hosbrook,* 81 S.D. 324, 134 N.W.2d 777, 780–81 (1965). Each element must be proved by clear and convincing evidence before there can be an estoppel. *Cromwell v. Hosbrook, supra* at 781.

■ In the instant case, the bank concealed a subordination clause in the middle of a document deceptively entitled, "Offer of Sale," and failed to explain the effect of the clause to Arlon. Further, the bank's agent falsely represented that Arlon would be assured payment if its representative signed the document. The concealment and representations involved material facts. Arlon's President did not know at the time that he was signing a subordination agreement, the legal effect of the agreement, or that the bank did not really intend to assure payments to Arlon. The bank deliberately concealed the subordination agreement and made the representations with the intent that Arlon would act upon them. Doubtless, the bank realized that Arlon's President would not have signed the document if the document had been entitled, "Subordination Agreement," and the bank had refused to assure payments to Arlon. Arlon relied on the bank's representations and signed the document thereby subordinating their prior first lien interest to the bank, to Arlon's prejudice and injury.

Consequently, based on the foregoing analysis, the bank is estopped from enforcing the subordination agreement against Arlon.

■ If there is a total failure or want of consideration, a party may assert the failure as a defense to enforcement of the underlying transaction. *American State Bank v. Cwach,* 85 S.D. 562, 187 N.W.2d 107, 110 (1971). In the instant case, the bank obtained lien priority through the subordination agreement with Arlon. Arlon obtained absolutely *nothing* for the detriment of losing its lien priority either at the time the document was signed or subsequent thereto. Therefore, the subordination agreement is not supported by consideration and, thus, is not enforceable against Arlon.

■ "When a benefit is conferred upon a party by another and the former recognizes and accepts the benefit under circumstances where it would be inequitable for him to do so without payment for the benefit, the court will imply a contract between the parties regardless of their assent thereto." *Ringgenberg v. Wilmsmeyer,* 253 N.W.2d 197, 202 (S.D.1977). Under the circumstances of the instant case, it would be inequitable for the Court to allow the bank to retain the benefit of the subordination agreement without paying the funds it assured Arlon to induce it to sign the subordination agreement. An implied-at-law contract exists between the two parties. The bank will not be allowed to enforce the

subordination clause against Arlon because it would be unjustly enriched through retention of a first priority lien.

It is well settled that a bankruptcy court may subordinate a creditor's claim under the proper circumstances. *Crowder v. Allen-West Commission Co.,* 213 F. 177, 184 (8th Cir.1914); *Kapp v. Naturelle, Inc.,* 611 F.2d 703, 708 (8th Cir.1979). Section 510(c)[7] of the new Bankruptcy Code codifies this long-recognized power. S.Rep. No. 95–989, 95th Cong., 2d Sess. 74 (1978), U.S. Code Cong. & Admin.News, p. 5787. "Subordination is an equitable power. We recognize the principle that a bankruptcy court is a court of equity, charged to apply equitable principles to reach equitable results when administering the Bankruptcy Act. In doing so, the bankruptcy 'Chancellor' may disregard form for substance and alter the result which would be obtained under a formal application of general legal principles in order to do equity." *In re Ahlswede,* 516 F.2d 784, 787 (9th Cir.1975), *citing Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

The seminal modern authority on equitable subordination in bankruptcy is the Fifth Circuit's decision. *Matter of Mobile Steele Co.,* 563 F.2d 692 (5th Cir.1977) (hereinafter *Mobile* ). *Mobile* prescribes three elements that must be satisfied before the exercise of equitable subordination is appropriate: (1) The claimant must have engaged in some type of inequitable conduct; (2) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; (3) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act. *Mobile, supra* at 699–700.

■ Furthermore, in determining whether these three elements are satisfied, a court should be mindful of three relevant and related principles. First, the inequitable conduct required need not be related to the acquisition or assertion of the controverted claim as long as it is directed toward the bankrupt or its creditors. *Mobile, supra* at 700, *citing In re Kansas City Journal-Post Co.,* 144 F.2d 791, 803–04 (8th Cir. 1944). Second, the claim should be subordinated only to the extent necessary to offset the harm occasioned by the inequity upon the bankrupt and its creditors. *Mobile, supra* at 701. Third, as relates to the respective parties' burden of proof, the party objecting to another's verified claim must come forward with enough substantiations to overcome the claimant's prima facie case; at which time, the claimant must prove the validity of his claim by a preponderance of the evidence. *Matter of Multiponics, Inc.,* 622 F.2d 709, 714 (5th Cir.1980); *Mobile, supra* at 701.

■ Applying the facts of the instant case to the elements of equitable subordination as defined in *Mobile* and considering the application in light of the guiding principles prescribed in *Mobile,* the Court concludes that the bank's claim must be subordinated to Arlon's mechanic's lien. Having already found facts supporting legal conclusions of fraud, estoppel, failure of consideration, and unjust enrichment, the Court need not once again belabor the bank's inequitable conduct. Suffice it to say that the facts clearly establish a breach of the multitude of rules of fair play and good conscience including judicial distaste for fraud and overreaching. *See Pepper v. Litton, supra,* 308 U.S. at 310, 60 S.Ct. at 246–247.

As to the second prong of the *Mobile* test, the bank's inequitable conduct caused Arlon to lose lien priority in a manner that would confer an unfair advantage on the bank. But for the bank's concealment and misrepresentations, Arlon would not have signed the agreement and would not have had its lien subordinated to the bank's lien.

---

**7.** Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
    (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
    (2) order that any lien securing such a subordinated claim be transferred to the estate. 11 U.S.C. § 510(c).

The last prong of the *Mobile* test requires that an equitable subordination not be inconsistent with other provisions of the Bankruptcy Act. This Court cannot find any provisions of the Code that would be inconsistent with subordinating the bank's claim to Arlon's claim.

In reaching the conclusion that the bank's lien must be subordinated to Arlon's lien, the Court has been cognizant of the principles enunciated in *Mobile*. The bank's lien has only been subordinated as to Arlon's lien, as this is all that is necessary to remedy the harm occasioned by the bank's inequitable conduct. Further, Arlon not only came forward with overwhelming evidence to overcome the prima facie valid claim of the bank, the bank was unable to come anywhere close to proving the validity of its claim by a preponderance of the evidence. Even if Arlon would have had the full burden of proof, it would have prevailed as it succeeded in establishing numerous defenses requiring clear and convincing evidence.

### CONCLUSION

In summary, based on all the foregoing, the Court concludes that Arlon holds a valid mechanic's lien in the amount of $180,494.12 secured by the property described in trial exhibit No. 1. Moreover, Arlon's mechanic's lien is prior and superior to the bank's mortgage and security interest because the subordination agreement signed by Arlon's President on July 16, 1980, is unenforceable under 11 U.S.C. § 510(a), and, in any event, the bank's liens are equitably subordinated to Arlon's mechanic's lien in accordance with 11 U.S.C. § 510(c) and the related case law.

The above constitutes the Court's Findings of Fact and Conclusions of Law in the above-entitled matter pursuant to Bankr. R.P. 7052 and Fed.R.P. 52. Counsel for Arlon Industries, Inc., is directed to submit an order and judgment consistent with the Court's Findings and Conclusions in accordance with Bankr.R.P. 9021. The order and judgment must be submitted to the Clerk of this Court forthwith.