**In the Matter of BIRD ENGINEERING, INC., Debtor.**

**TECUMSEH PRODUCTS COMPANY**

**v.**

**FIRST NATIONAL BANK AND TRUST COMPANY OF FREMONT, NEBRASKA.**

**Bankruptcy Nos. BK83–1657, BK83–1764.**

United States Bankruptcy Court, D. Nebraska.

March 1, 1985.

Maureen E. McGrath, Omaha, Neb., for Tecumseh Products Co.

Thomas B. Thomsen, Fremont, Neb., for First Nat. Bank and Trust Co. of Fremont.

## MEMORANDUM OPINION

DAVID L. CRAWFORD, Bankruptcy Judge.

This matter involves a dispute between two unsecured creditors of Bird Engineering, Inc., the debtor corporation. The First National Bank and Trust Company of Fremont, Nebraska, is the unsecured holder of a $300,000 subordinated capital debenture issued by the debtor, which the bank took as security for a $300,000 loan to Fred Schweser, Jr., principal stockholder of the debtor corporation. Mr. Schweser in turn loaned the monies to the debtor in exchange for the $300,000 subordinated capital debenture. Tecumseh Products Company is an unsecured creditor of the debtor and one of the debtor's major suppliers. The claim of Tecumseh Products is in excess of $350,000.

Tecumseh Products seeks, through a variety of theories, to subordinate the claim of the First National Bank to its claim or to the claims of all general unsecured creditors of the debtor.

The debtor was a manufacturer of recreational-type vehicles located in Fremont, Nebraska. Fred Schweser, Jr., was the sole stockholder of the company. Pursuant to a loan agreement dated May 1, 1978, the Omaha National Bank (ONB) was the primary financing agency for the debtor.

During a period of time from 1978 to 1980, Fred Schweser, Jr., was incapacitated and took no part in the business or its management. His father, Fred Schweser, Sr., had authority to act on behalf of his son in the operation of the company. During that period, a firm known as MCS, Management Consultant Services, worked with the company as management consultant and was instrumental in the operation of the company.

The business encountered financial problems, and in August of 1982, the Omaha National Bank declared the debtor's line of credit to be a "problem" line.

Early in 1983, with the financial problems of the debtor continuing, the Omaha National Bank required that an additional $300,000 of working capital be injected into the company as a condition precedent to the Omaha National Bank's continuing its financing of the company.

Fred Schweser, Jr., obtained that $300,000 additional working capital for the company by borrowing $300,000 from the First National Bank of Fremont on or about April 1, 1983, and in turn lending that $300,000 to the debtor in exchange for a $300,000 subordinated capital debenture. The debenture was then pledged to First National Bank of Fremont to secure his

loan from the bank. Mr. Schweser executed a security agreement for pledge of collateral and a separate document conveying the subordinated debenture to the First National Bank of Fremont. He also delivered the original debenture to the bank as security. As further security for the loan, Mr. Schweser pledged his stock in the debtor corporation and pledged stock in another corporation of which he was the sole stockholder.

The $300,000 borrowed by Mr. Schweser from First National of Fremont was then loaned to the debtor and the money was used by the debtor for operations and became part of its working capital.

The financial condition of Bird Engineering continued to deteriorate to the extent that in August of 1983, the Omaha National Bank discontinued its financing of the debtor and called its loans. ONB then arranged to sell substantially all of the physical assets of the company to Nebraska Engineering. That sale was done in the form of a voluntary repossession of the assets by Omaha National Bank from the debtor.

At the time of the sale of the debtor's assets, an agreement was reached between First National Bank of Fremont, Fred Schweser, Jr., the Omaha National Bank, and Nebraska Engineering whereby Schweser, the ONB, and Nebraska Engineering agreed to participate up to $50,000 each in any losses that might be suffered by the First National Bank after the assets of the debtor had been liquidated and distributed to creditors. These participation agreements were entered into on or about August 24, 1983, simultaneously with the sale of the assets of Bird Engineering to Nebraska Engineering. Fred Schweser, Jr., was released of any further liability to First National Bank of Fremont except for his agreement to participate in the First National Bank indebtedness up to $50,000.

Tecumseh Products Company, a major supplier of engines to the debtor, is the holder of an unsecured claim herein. The indebtedness of Bird Engineering to Tecumseh Products was secured by the personal guaranty of Fred Schweser, Jr., executed first in 1973 and again in 1974. As part of that guaranty, Mr. Schweser also agreed to subordinate any indebtedness owed him by the debtor to any debt which the debtor owed Tecumseh.

The debtor has been able to confirm a plan under Chapter 11 and this litigation exists because a fund of money has been created under that confirmed plan for distribution to creditors when their relative rights and priorities are determined.

At the outset, I conclude that First National of Fremont has a perfected security interest in the $300,000 subordinated capital debenture because it falls within the definition of an "Instrument" under Section 9–105 of the Nebraska Uniform Commercial Code. Section 9–305 of the Nebraska UCC specifies that perfection of a security interest in an instrument is accomplished by taking physical possession of it. That perfection would make First National of Fremont's claim to the proceeds of the debenture superior to the rights of all other parties, at least to the extent that the Uniform Commercial Code controls.

Tecumseh Products, however, contends that the subordination agreements it received from Mr. Schweser in 1973 and 1974 subordinate Mr. Schweser's claims to the claims of Tecumseh Products. Since those claims are now in the hands of First National of Fremont by virtue of the debenture, Tecumseh Products contends First National's claim is to be subordinated to the claim of Tecumseh Products. (It should be noted that the capital debenture which First National of Fremont holds is subordinated only to the claims of Omaha National Bank and not to general unsecured claims against the debtor.) Stated differently, Tecumseh Products argues simply that because Mr. Schweser's claims against the corporation were subordinated to the claim of Tecumseh Products, when Mr. Schweser assigned his debenture to First National of Fremont, the Bank took subject to the subordination agreement held by Tecumseh Products.

First National of Fremont claims that it was without notice, and there is no evidence to suggest that First National of Fremont knew, of the 1973 or 1974 subordination agreements held by Tecumseh Products. Therefore, the Bank asserts that the subordination agreement is ineffective as against it, arguing that Tecumseh Products should have complied with the Uniform Commercial Code's filing requirements if it were to give constructive notice to First National of its claim under the subordination agreement.

Tecumseh counters that subordination agreements are not covered by the Uniform Commercial Code and points to an optional provision, Optional Section 1–209 of the Uniform Commercial Code and the Comments following. The Comments appear to say that there is no intention to make subordination agreements subject to the provisions of Article 9 of the UCC.

I would conclude generally that subordination agreements need not be perfected under the Uniform Commercial Code to be effective. However, in the limited case where a creditor holding a subordination agreement seeks to enforce it against a secured party's perfected interest in an "instrument", it would seem that the party with the subordination agreement will have to have complied with the Uniform Commercial Code or will find that its rights are those of an unperfected security interest holder subordinated to the perfected security holder's claim. Thus, Tecumseh Products's subordination agreement is not superior to the claim of First National of Fremont with its perfected security interest in the debenture.

■ Alternatively, Tecumseh Products contends that although the debenture is called a "Capital Debenture" it should in fact be found to be an equity infusion and not debt. Here Tecumseh Products points to a number of cases dealing with the right of individuals who have loaned money to failing corporations and who have later sought to classify those loans as bad debt deductions against contentions by the Government that they were infusions of capital in fact if not in word. [See, for example, *J.S. Biritz Construction Co. v. Commissioner*, 387 F.2d 451 (8th Cir.1967); *In Re Uneco, Inc.*, 532 F.2d 1204 (8th Cir. 1976).] Those cases set forth a number of criteria which are objective standards for determining whether a loan made to a thinly capitalized corporation is to be treated as a loan or an infusion of equity when determining whether a bad debt deduction should be allowed. Whatever the outcome in that arena, the test should be otherwise when we deal, as here, with a bank's taking a security interest in a corporate debenture in exchange for a loan made directly to the president of the corporation, and where as here, there is no evidence of improper manipulation by the bank or actual knowledge of the under-capitalized nature of the corporation which spawned the debenture. In the instant case, there is no evidence that First National of Fremont had any knowledge of the capital structure of the debtor corporation. Thus, I conclude that the rationale of the tax-related cases should not be superimposed on this case. At issue is a reasonably straight-forward commercial transaction of a commercial lender lending upon the strength of a corporate debenture without knowledge of the capital structure of the corporation. Accordingly, I decline to characterize the debenture as equity which would relegate First National to payment with other stockholders of the corporation.

■ For its final theory, Tecumseh Products asserts that the claim of First National of Fremont should be equitably subordinated under 11 U.S.C. Section 510(c) of the Bankruptcy Code. That statutory provision authorizes subordination under the label of "equitable subordination" without providing any guidelines for its application, to-wit:

... after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or

all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate. 11 U.S.C. 510(c)

Some help in applying the statutory provision in question is supplied by a recent article, DeNatale & Abram "The Doctrine of Equitable Subordination as Applied to Non-management Creditors," 40 *Bus.Law.* No. 2, 417 (Feb. 1985).

In order to employ the doctrine of equitable subordination, certain requirements must be met. Fraud or other inequitable conduct must have occurred which produced actual harm to other creditors or resulted in an unfair advantage in the bankruptcy distribution results. Additionally, subordination of the claim or interest must not be contrary to the principles of the bankruptcy laws. [See DeNatale & Abram, *Id.;* In re Multiponics, 622 F.2d 709 (5th Cir. 1980)].

■ Where fraud or misrepresentation affects part or the entire bankruptcy estate, where there is such domination and control by a creditor that a duty arises toward other creditors, or where there is other inequitable conduct, the doctrine of equitable subordination has been applied. See e.g., *In re Mobile Steel Co.*, 563 F.2d 692 (5th Cir.1977); *In re T.E. Mercer Trucking Co.*, 16 B.R. 176 (N.D.Tex.1981); *In re Sepco, Inc.*, 36 B.R. 279 (D.S.Dak. 1984); *In re Monex Corp.*, 32 B.R. 82 (S.D. Fla.1983): [Conduct did not justify reordering priorities for distribution.]. Further, where equitable subordination is applied, "... it can ... ordinarily go no farther than to level off actual inequitable disparities on the bankruptcy terrain for which a creditor is responsible, to the point where they [sic] will not create unjust advantages in claim positions and liquidation results ... [its application must be] fitted to the actual injury that has been done or the unjust enrichment that is involved." *In re Kansas City Journal-Post Co.*, 144 F.2d 791, 801 (8th Cir.1944).

■ Equitable subordination is unwarranted in this case. It is important to note that I deal with the claim of First National of Fremont. There is no evidence before me to indicate that First National of Fremont dealt with this debtor corporation in any way except in an arm's-length transaction. It had no history of involvement with the debtor and in fact had not actively sought one. First National of Fremont had no knowledge of the capital structure of the debtor and relied when making the $300,000 loan to Mr. Schweser upon Omaha National Bank's continued financing of the business. It seems to me that all that First National of Fremont did which can be said to be irritating to other unsecured creditors is to find itself in the fortuitous position of having an indebtedness due from Mr. Schweser from which he wanted release at a time when Omaha National Bank sought Schweser's voluntary relinquishment of possession of the assets of the corporation. At the time when the sale of the physical assets of the corporation was desirable in Omaha National Bank's opinion, Mr. Schweser held a key position. His consent to voluntary repossession by Omaha National Bank was essential. From that bargaining position, Mr. Schweser required that his indebtedness to First National be modified as the price of his voluntarily relinquishing possession of the assets. At this point, Omaha National Bank and Nebraska Engineering agreed to buy participation agreements in the $300,000 indebtedness up to a maximum of $50,000 each, Mr. Schweser agreeing also to participate to the extent of $50,000. Each needed the other. First National of Fremont simply benefited from the dynamics of the situation. That is not the type of conduct contemplated in the cases authorizing equitable subordination, and I decline to do so here.

In general, my finding is in favor of First National of Fremont and against Tecumseh Products. A separate order is entered in accordance with the foregoing.