In re DAKOTA COUNTRY STORE FOODS, INC., a South Dakota corporation, Debtor.

A. Thomas POKELA, Trustee, Plaintiff,

v.

RED OWL STORES, INC., a Delaware corporation; Wickes Companies, Inc., a Delaware corporation; and WCI Financial Corp., a Delaware corporation, Defendants.

Bankruptcy No. 486–00672.
Adv. No. 87–4007.

United States Bankruptcy Court,
D. South Dakota, S.D.

Dec. 11, 1989.

Steven W. Sanford, Cadwell, Sanford & Deibert, Sioux Falls, S.D., for plaintiff.

John C. Quaintance, Quaintance and Johnson, Sioux Falls, S.D., David L. Graven (David L. Graven, Larry M. Wertheim and Bonnie Wilkins, on brief), Holmes and Graven, Minneapolis, Minn., for defendant Red Owl Stores, Inc.

Stuart L. Tiede, Woods, Fuller, Shultz & Smith, P.C., Sioux Falls, S.D., for defendants Wickes Companies, Inc., and WCI Financial Corp.

Patrick T. Dougherty, Dougherty and Dougherty, Sioux Falls, S.D., for Kenneth E. Wagenman.

## MEMORANDUM DECISION

PEDER K. ECKER, Bankruptcy Judge.

### ACTION

Chapter 7 Trustee A. Thomas Pokela (Trustee) filed an adversary complaint seeking adjudication of whether: the repossession of a grocery store by Red Owl Stores, Inc. (Red Owl), and the other named defendants is an 11 U.S.C. § 547(b) preference (hereinafter the 11 U.S.C. is omitted where a section to 11 U.S.C. is referenced); defendants' security interests are voidable pursuant to Section 544; transfers to Red Owl defrauded creditors, as less than reasonably equivalent value was received; transfers Red Owl ordered while controlling debtor constitute an abuse of power to the detriment of other creditors; and whether Red Owl's conduct warrants equitable subordination and punitive damages. Red Owl argues: the grocery store is not part of the debtor's estate, Dakota Country Store Foods, Inc. (Corporation); the repossession gave Red Owl no more than it would receive in a Chapter 7; Red Owl is the constructive owner having an equitable lien; and Red Owl was the first perfected security interest. The Court holds: (1) the Corporation acquired the grocery store; (2) Red Owl's security interest was not perfected prior to the repossession; (3) the repossession is a Section 547(b) preference; and (4) equitable subordination, but not punitive damages, is appropriate.

The plaintiff Trustee and defendant Red Owl agree that the instant matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(F) and 157(b)(2)(K). This Court has jurisdiction over the parties and subject matter of this action under 28 U.S.C. § 1334. This memorandum constitutes findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52 and Bankr.R. 7052. Red Owl's Sioux Falls, South Dakota, store sale weaves the tale of a grocer's Paradise Lost.

### FINDINGS OF FACT

Red Owl, a Delaware corporation, headquartered in Hopkins, Minnesota, maintains over four hundred supermarkets in a six-state region. Red Owl's trademark trade names include Red Owl, Country Store, and Wise Buy. Each trademark maintains a uniquely targeted marketing plan. Red Owl distributes its products either in grocery stores Red Owl owns or through independent retailers. Wickes Companies, Inc. (Wickes), or WCI Financial Corp. (WCI) occasionally provide Red Owl's financing. Red Owl's top management, Patrick Shulke, Charles Bidwell, and Curt Stephan, purchased Red Owl from Wickes on April 17, 1986. This Court granted summary judgment dismissing with prejudice

the complaint against Wickes and WCI on April 4, 1988.

To increase profit, Red Owl's management, in 1982, schemed to sell some of Red Owl's own stores to independent retailers who would be responsible for the stores and purchase much of their inventory needs through Red Owl. This is essentially the same management which bought out Red Owl in 1986. About ninety stores were involved in the sale; the least profitable stores were sold off first. The divestiture program included a Red Owl-owned retail grocery store in Sioux Falls, South Dakota (grocery store or Sioux Falls store), which lost an average of $31,000 a month from January, 1984, through June of 1985. In the Spring of 1985, Red Owl put the unprofitable Sioux Falls store on the market.

Red Owl's Fargo, North Dakota, Division Manager, William Anderson (Anderson), informed Kenneth E. Wagenman (Wagenman) of Milbank, South Dakota, during April or May, 1985, that the Sioux Falls store was available. Anderson supplied Wagenman's Red Owl franchise in Milbank with Red Owl products and supplied the Sioux Falls store, also. Wagenman operated his Milbank store as a sole proprietor.

Wagenman led a team to buy the Sioux Falls independent retailer with cash contributions from Joseph G. Hoseck (Hoseck), Gary L. Jensen (Jensen), and Wagenman himself. Red Owl encouraged the Sioux Falls store sale through creative financing, fostering an atmosphere of enthusiastic support initially, and providing the buyer with optimistic profit/loss projections. Wagenman, Hoseck, and Jensen entered the sale transaction intent on putting the Sioux Falls store in the black and finding financial paradise. Anderson suggested the Sioux Falls store be operated as a corporation. Anderson's advice was followed.

Late in June, 1985, Wagenman, Jensen, and Hoseck, none of whom were involved in corporate organization prior to the Corporation, employed an attorney from Milbank, South Dakota, and a certified public accountant to expedite creation of the Corporation. Corporate formation was hastened because Red Owl accelerated the date the buyer took possession of the store from July 13 to June 30, 1985. The race to incorporate and consummate the sale caused a $40,000 capital contribution to be sent to Red Owl without first going through the Corporation, and, yet, stock certificates were issued.

The State of South Dakota issued the Corporation's Certificate of Incorporation on June 28, 1985. Wagenman, Jensen, and Hoseck (together as Directors) served as the Corporation's first Board of Directors. Wagenman was President, Hoseck was Vice President, and Jensen was Secretary and Treasurer. The Corporation operated without the benefit of counsel except for corporate formation and conducting a minutes meeting on July 25, 1985. Anderson learned of the Corporation since at least July or August, 1985, from a conversation with the Directors.

The paper trail reducing the sale transaction to writing occurred from June 25, 1985, through July 10, 1985. Documents executed in this contemporaneous time frame concern the sale and financing of the grocery store. Red Owl prepared all documents, and most, if not all of them were executed in South Dakota. The Directors, without the benefit of counsel, signed all sale memoranda without corporate designations after their signatures.

The Security Agreement, Sublease, and Agreement to Purchase were the initial documents signed. They were dated June 25, 1985, three days before the Certificate of Incorporation was issued by the Secretary of State but two days before the takeover date. The Security Agreement, Sublease, and Agreement to Purchase referred to the buyer as Wagenman, Hoseck, and Jensen. These documents designate the seller as Red Owl Stores, Inc., and are signed by El Teske, Vice President of Red Owl, and the three individuals. The Agreement to Purchase required Red Owl's prior written consent to assign any obligations.

On or before June 27, 1985, Vern Schok, a Red Owl employee charged with seeing the sale through to completion, filled out a

questionnaire listing the buying entity to operate the Sioux Falls store as a corporation. The pertinent question specifically asked, "store will be operated as a," and gives three choices, of which "corporation" was selected. The questionnaire listed the store name as "Dakota Country Store Foods" and the owner as Wagenman. Distribution of the questionnaire included Red Owl's top management and all of Red Owl's departments. Information on the questionnaire served as operational data base information directing Red Owl's computer to handle the Corporation's account properly. The questionnaire informed Red Owl that the buyer was the Corporation, as evidenced by Red Owl designating the Corporation as the grocery store's operator on applications sent to: the Unemployment Insurance Division of South Dakota; the South Dakota Sales and Use Tax Division; and the Internal Revenue Service (I.R.S.).

Critical sale documents were executed on or about June 30, 1985. An Independent Retailer Agreement, Guaranty of Independent Retailer Agreement, Equipment Lease Agreement, and Promotional Allowance Red Owl Independent Retailer Agreement dealt with the heart of the sale, resulting in the transfer of physical control, the keys, on June 30, 1985. The Independent Retailer Agreement designates the seller as "Red Owl Stores, Inc.," and the buyer as "Dakota Country Store Foods." Red Owl is consistently declared a Delaware corporation, but the Red Owl-prepared documents fail to denote what type entity the buyer, Dakota Country Store Foods, is. The Independent Retailer Agreement's signature line did not expressly reference Red Owl, but, rather, was signed by "Vern Schok District Manager" and "El Teske Vice President Company." The Directors signed without title after their names. A Director, questioning Schok why the signature lines on the memoranda were in the manner presented, was told that is the way they came down from Red Owl. Director Wagenman testified he never intended to personally own any of the assets sold by Red Owl. An attached Red Owl-prepared personal guarantee was not executed by the Directors. Red Owl never prepared a bill of sale nor did it ever comply with bulk sales requirements.

Shoestring financing of the store's assets, worth about $670,000, required only $40,000 cash down. Sale values included such things as $147,000 equipment and $243,215 original inventory. Five thousand dollars earnest money accompanied the June 25, 1985, document execution. Red Owl received the remaining $35,000 on or about July 10, 1985.

Red Owl or one of its affiliates financed other independent operators in a fashion similar to the highly leveraged Sioux Falls operation. Multiple notes and bank debiting made up the balance of the $630,000 debt owed to Red Owl. Notes contemporaneous to the 1985 summer sale, executed by the Directors who again signed with nothing after their names, were part of sale financing. These notes include: inventory for $243,215; supplementary note for $100,000; and a note for $40,000. A subsequent note for additional inventory of $100,000 was executed February 6, 1986.

Red Owl filed numerous financing statements throughout its relationship with the Sioux Falls independent retailer. On July 15, 1985, it filed a financing statement under "Red Owl Store # 410970295." The number following the store apparently refers to the buyer's federal employer identification number, which does not correspond to the Corporation's number as explained by a December 4, 1986, I.R.S. notice.

More financing statements were filed on April 18, 1986, under the Directors' individual names with their social security numbers. The 1986 financing statements were the result of an effort to cure filing defects discovered in a document review prompted by a management buy-out. The management buy-out involved selling the loans on the Sioux Falls store sale to Wickes. Pursuant to management buy-out, a request for copies of financial statements filed showed nothing for the Corporation nor any of its Directors pertaining to the Sioux Falls store sale. Despite a conscious attempt to cure acknowledged filing deficiencies, not a single financial statement was filed in the name of the Corporation. Red

Owl maintains it could regain the loans carried by Wickes and WCI simply, pursuant to the management buy-out, by demand.

Red Owl argues the financing statements prove it believed the grocery store was not sold to a corporation. This argument flies in the face of Red Owl's otherwise mostly consistent treatment of the Corporation as the grocery store operator. Red Owl represented to third parties and the Corporation, and Red Owl's own internal documents express that the Corporation operated the store. Treating the financing statements differently from most other matters indicates the staff involved in preparing the financing statements ignored the corporate entity while the rest of Red Owl knew of the Corporation. Red Owl's verification of notes and estoppel letter of March 26, 1986, were signed by Wagenman as President of the Corporation. There was no request to the other two Directors for signatures. A letter from the Corporation, congratulating Red Owl's management on its buy-out, included the word, "Inc."

Red Owl debited the independent retailer's bank account at First National Bank, Sioux Falls, South Dakota. Whether the Corporation or the Directors individually established this account is a disputed issue. The bank account was established in June, 1985. The Corporation formally authorized the bank account at a July 25, 1985, minutes meeting. Red Owl argues the First National Bank account was not a proper corporate account, whereas the Corporation alleges the account is corporate, pointing to completion of the corporate identification formation form and bank writings indicating the account was intended for "Dakota Country Store Foods, Inc., d/b/a Dakota Country Store Foods." The backsides of the bank writings list the three Directors in their corporate posts. While the bank's signature cards lacked a corporate designation, most checks were written in corporate form. Red Owl does not deny that it debited this account throughout its course of dealing with the Sioux Falls independent retailer. The bank account Red Owl debited belonged to the Corporation.

The Corporation authorized Red Owl to debit its bank account on an ongoing basis to pay for inventory purchased and on a weekly basis of $10,000 to pay for the grocery store. Red Owl's $10,000 weekly debit was an orally agreed upon simple plan. Basically, the Corporation obtained goods from vendors (trades payable) on credit, sold these goods, and used the proceeds to help pay the grocery store's purchase price. Trades payable were unsecured creditors who were projected to supply seventy-five to eighty percent of sales. Red Owl tracked the Corporation's debt on an account called a 403 Ledger account. This account reflects at least $150,000 attributable to weekly $10,000 debits.

Bank debit power allowed Red Owl an advantage over trades payable who lacked such power, although trades payable's sales contributed to the grocery store's revenues. The Corporation's bank account included revenues generated from trades payable. Red Owl siphoned funds generated by store sales for the store's purchase price regardless of whether they were from trades payable or not. Red Owl received regular payments while the trades payable did not. Trades payable were essential to Red Owl's skimming $10,000 off the Corporation's bank account on a nearly weekly basis.

The Corporation voluntarily chose to use some of Red Owl's many services for a fee. Services Red Owl performed for the Corporation included filing tax returns, monitoring payroll, and filing periodic reports with the Unemployment Insurance Division. Red Owl designated the Corporation as the Sioux Falls independent retailer in insurance and tax reports Red Owl periodically prepared for third parties, as well as internal-use documents. Documents, such as financial statements prepared by Red Owl for the Corporation, named the Sioux Falls independent retailer as the Corporation. In addition, a Training Incentive Planning Service Retailer Agreement dated July 9, 1986, was entered into between Red Owl and "Dakota Country Store Foods, Inc." Red Owl's acceptance of the Corporation as the grocery store's operator is shown by Red

Owl designating the Corporation as the store owner on documents sent to third parties, by executing a contract which expressly named the Corporation, and internal Red Owl documents.

Despite attempts by the Corporation to make the Sioux Falls store profitable, it snowballed debt. The first month's $50,000 operating loss eroded the Corporation's initial $40,000 capital investment. The Corporation never turned a profit. The Corporation's tax returns reflect losses the Sioux Falls grocery store incurred. Red Owl financially carried the Corporation by providing additional credit such as the supplemental February, 1986, $100,000 promissory note. Despite the Corporation's extensive sustained losses, Red Owl decided in May, 1986, that propping up the independent retailer was in Red Owl's best interest. A Red Owl internal analysis established Red Owl profited by leaving the financially hemorrhaging independent retailer in Sioux Falls because it cost Red Owl less to leave the independent retailer in Sioux Falls than to repossess the store. The bulk of this analysis attributed to Red Owl's benefiting from a long-term lease and funneling trades payable funds into Red Owl.

Mounting losses prompted Red Owl to exert control over Sioux Falls operations. A "SWAT" team from Red Owl conducted a fruitless on-site inspection in a feeble attempt to remedy the Sioux Falls store's problems. A Corporation idea to use S & H Green Stamps was crushed by Red Owl. Red Owl employee Jim Almsted said, "You do that and we'll come and get the keys." The Corporation accepted Red Owl's green stamp stand because of the money owed to Red Owl and the status of delinquent payments. Red Owl was more or less saying that it was somewhat calling the shots at this point and Red Owl didn't want the Corporation involved. Red Owl threatened to take back the store on more than one occasion. Additionally, Red Owl told the Corporation to string out trades payable, saying, "... work them (the trades payable creditors) out as far and as long as you can, avoid paying as long as possible." The Corporation complied with Red Owl's demand because it had nowhere else to get credit. Hoseck felt at the six-month point that things were going well, but it turned out that Red Owl made a $100,000 inventory error which may have lulled the Corporation to inaction.

The Directors, anxious over the Corporation's hemorrhaging into financial death, sought a meeting with Red Owl corporate officials in August, 1986, to personally plead for help from Red Owl officers. The Directors left the August, 1986, Red Owl meeting in Hopkins, Minnesota, with a feeling that all would work out well. The Directors drove back to Sioux Falls making grandiose paradise plans for the future. The future appeared even brighter when the Directors were ordered into the Hopkins office the next Tuesday.

Red Owl's management stunned the Directors at the August 12, 1986, meeting by thrusting Peaceful Repossession and Sublease Termination Agreement papers (together as repossession papers) upon them. Red Owl predicated the repossession of collateral property on two defaulted checks by which Red Owl deemed itself insecure per the Independent Retailer Agreement. The Independent Retailer Agreement, however, lacks an insecurity clause. The August 12, 1986, repossession required that the notes be transferred from Wickes and WCI to justify triggering the repossession, which did not occur before the repossession occurred. Red Owl's repossession blitzkrieg included an air assault by a Red Owl employee flown in from Minnesota to empty out the Corporation's bank account. News of the bank attack was smuggled to Wagenman by his wife, who broke through Red Owl by phoning Wagenman under the pretense that his child was ill. Like unsophisticated horsebacked Polish fighters facing a highly mechanized army of Panzers and Stukas, the Corporation's resistance crumbled. Without the benefit of counsel, the Directors signed the repossession papers with nothing after their names.

Red Owl continued operating the seized Sioux Falls store after the repossession. No Bulk Sales Act compliance was accomplished as to the plunder. Red Owl had the spoils inventoried, charging half the cost

for this task to the Corporation's 403 Ledger account, and valued the captive leasehold and equipment. Red Owl valued the assets repossessed at $610,173 (inventory $410,641; supplies $8,706; change fund $5,475; accounts receivable $14,802; postage stamps $33; and fixed assets at a depreciated value of $170,516, with all figures rounded to the nearest dollar). In addition is the bank seizure of $20,000. Inventory turns over about once a month, so the August, 1986, inventory is not the same as when the independent retailer opened in 1985. As of the August 12, 1986, repossession, the state of the Corporation's accounts to Red Owl was liabilities of $934,303 and assets amounting to $630,173, leaving a debt shortfall of $304,130. The Corporation filed a Chapter 7 bankruptcy petition on November 7, 1986, eighty-seven days after the seizure occurred. Upon investigation, the Chapter 7 Trustee discovered the repossession, prompting an adversary complaint. The Chapter 7 Trustee has recovered only $6,800 thus far. The essence of the parties' claims is reduced into three issues, which are addressed seriatim.

## ISSUES

I. Who acquired the grocery store from Red Owl in light of: execution of most of the sale transaction memoranda and the bulk of payment occurred after the Corporation received its Certificate of Incorporation; Red Owl-prepared memoranda are ambiguous as to who the buyer is; Red Owl's agents knew the buyer would be operated as a corporation; Red Owl issued no bill of sale nor complied with the Bulk Sales Act requirements at the time of the sale; the Corporation's agents consistently signed their names absent any title, the three of whom are the three sole directors and shareholders in the Corporation; Red Owl treated the Corporation as the Sioux Falls independent retailer; and Red Owl debited the Corporation's bank account to pay for the grocery store? The Corporation.

II. Is Red Owl's peaceful repossession of the grocery store a Section 547(b) preference when Red Owl never filed a proper financing statement but became a secured creditor by perfecting its claim by possession of collateral eighty-seven days before the bankruptcy petition was filed? Yes.

III. Is equitable subordination appropriate treatment of Red Owl's claim and behavior when Red Owl's significant control of the grocery store resulted in Red Owl's claim being paid to the detriment of the trade creditors? Yes.

## DECISION

### I.

#### A. South Dakota Law Governs.

Whether the Corporation ever acquired the grocery store is a threshold issue decided under state law. State law controls acquisition because the formation and rights of a corporation are created by state law. *See* S.D.C.L. § 47–1–1, *et seq.* Corporate acquisition of the store is essential because if the Corporation never acquired the Sioux Falls grocery store, then the store could never be property of the Corporation's bankruptcy estate.

The sale memoranda recite that South Dakota law governs the parties' agreement. South Dakota applies the Uniform Commercial Code (U.C.C.), as legislatively amended, to business transactions. *Golden Plains Feedlot, Inc. v. Great Western Sugar Co.*, 588 F.Supp. 985, 989 (D.S.D. 1984). Contracting parties under U.C.C. § 1–105 may agree to have their agreement governed by a particular state's law so long as the transaction bears a reasonable relation to that state. *Id.;* S.D.C.L. § 57A–1–105 (hereafter U.C.C. sections, as adopted by South Dakota, may be located in the South Dakota Codified Laws by adding 57A– to the U.C.C. section cited). A reasonable relation exists in the state where a significant enough portion of the making or performance of the contract occurs. *See Seeman v. Philadelphia Warehouse Co.*, 274 U.S. 403, 47 S.Ct. 626, 71 L.Ed. 1123 (1927). In addition to U.C.C. § 1–105, South Dakota enacted a contract choice of law statute. S.D.C.L. § 53–1–4.

■ South Dakota's general contract choice of law rule mandates contract interpretation according to the law of the place of performance or, if the contract does not indicate a place of performance, according to the place of its making. *In re Worden*, 63 B.R. 721, 723 (Bankr.D.S.D.1986). South Dakota law governs the grocery store sale under U.C.C. § 1–105 and S.D. C.L. § 53–1–4 because the place of contracting and performance is South Dakota. Most, if not all, of the memoranda execution occurred in South Dakota. Agreement performance is South Dakota since goods were supplied to the Sioux Falls grocery store, the fixtures and equipment were in Sioux Falls, and Red Owl debited the Corporation's Sioux Falls bank account for at least $150,000 to pay for the sale. South Dakota's law bears a substantial relation to the parties' express choice of law based on execution and performance of the contract.

B. Corporate Contract Ability.

Red Owl perspicaciously argues the 1985 summer sale memoranda are the focal point of whether the Corporation acquired the grocery store. These Red Owl-drafted documents articulate specific legal rights, duties, and obligations. The Agreement to Purchase requires written approval for obligation assignment. Red Owl never granted a written assignment.

The agreement is the bargain of the parties in fact, as found in their language or by implication from other circumstances such as course of performance. U.C.C. § 1–201(3). The entire memoranda must be considered in ascertaining the intention of the parties, for a determination of whether the corporation or an individual is bound by the contract depends largely upon the intention of the parties. 7 Fletcher, *Cyclopedia of Corporations* § 3034, at 174 (permanent ed. 1983). The U.C.C.'s examination of intent starts with the express language the parties used, and, in light of the written assignment clause, adjudication of whether the legally formed Corporation acquired the grocery store focuses on the sale documents. The issue of whether a contract exists where no corporation arguably existed is a question of

fact. *LeZontier v. Shock*, 78 Mich.App. 324, 328, 260 N.W.2d 85, 89 (1977). Arguments attacking the Corporation's ability to enter into the sale transaction are addressed before the express language of the memoranda is examined.

A corporation is an artificial legal creation, invisible and intangible, capable of acting only through its officers and agents. *Aimonetto v. Rapid Gas, Inc.*, 80 S.D. 453, 458, 126 N.W.2d 116, 119 (1964). A Certificate of Incorporation is conclusive of proper incorporation. S.D.C.L. § 47–2–7. The Corporation became a conclusively established de jure South Dakota corporation on June 28, 1985, when the South Dakota Secretary of State issued its Certificate of Incorporation. Furthermore, presumption should be indulged in favor of corporate existence after the corporation operates. *Forest Home Cemetery Ass'n v. Dardanella Financial Corp.*, 329 N.W.2d 885, 887 (S.D.1983). The Corporation, through it agents, the Directors, was legally entitled to enter into agreements under South Dakota law.

Genuine corporate organization, even when adopted for the express purpose of avoiding personal liability, is not to be lightly disregarded. *Nat. Bank of South Dakota v. Clason*, 266 N.W.2d 573, 575 (S.D.1978). The corporation must be looked at as a separate legal entity unless contrary reasons exist. *Farmers Feed & Seed, Inc. v. Magnum Enterprises, Inc.*, 344 N.W.2d 699, 701 (S.D.1984). The Corporation's corporate identity remains intact against Red Owl's claims even if incorporation occurred merely for tax and liability advantages.

■ Corporate status exists despite the highly leveraged grocery store sale. Inadequate corporate capitalization is measured at formation, considering the nature of the business and the particular corporation. *Southern Lumber & Coal Co. v. M.P. Olson R.E. & Const. Co., Inc.*, 229 Neb. 249, 257, 426 N.W.2d 504, 509 (1988). Red Owl financed other independent retailers in a similar, if not worse, manner, and some were successful. The Directors contribut-

ed their experience in the grocery field, as well as cash. The Corporation complied with the $1,000 minimum capital contribution requirement. S.D.C.L. § 47–3–40. Although thinly capitalized, the Corporation was not inadequately capitalized under circumstances where statutory capital compliance existed, experienced talents were invested, and similar financing plans met success. The Corporation was not a mere alter ego of the Directors, but rather a corporate entity competent to enter into an agreement to buy a grocery store.

 The plethora of documents executed in the Summer of 1985 constitutes memoranda describing one transaction, the sale of the Sioux Falls grocery store. When two or more documents are executed at the same time as part of the same transaction, the court must consider and construe the instruments as one contract. *G.M.S., Inc. v. Deadwood Social Club, Inc.*, 333 N.W.2d 442, 444 (S.D.1983); Fletcher, *supra*, § 3034, at 174; E. Farnsworth, *Contracts* § 7.10, at 493 (1982). These documents were executed contemporaneously enough to be considered executed at the same time. In construing a conveyance, words are construed in pari materia and construction should be adopted which gives effect to all words; each word and provision should be given the significance consistent with, and which will effectuate, the manifest intention of the parties. *Northwest Realty Co. v. Jacobs*, 273 N.W.2d 141, 145 (S.D.1978). The grocery store sale documents are to be viewed as memorializing one transaction. For example, the June 29, 1985, promissory notes would never have been executed but for the June 25, 1985, Agreement to Purchase.

Presumably, parties to a contract know and understand its contents and believe that it expresses the true intention of the parties. *Ryken v. Blumer*, 307 N.W.2d 865, 868 (S.D.1981). Memoranda executed on June 30, 1985, concerned documents signed June 25, 1985. Because memoranda detailing one transaction must be analyzed in their entirety to determine the bargain the parties knew and understood, the specific order the documents were executed,

taken alone, does not conclusively determine the bargain. Therefore, Red Owl's initial designation of the buyer as Wagenman, Jensen, and Hoseck, but subsequent designation of the buyer as "Dakota Country Store Foods," does not prevent the Corporation from being considered as the buyer.

 Corporate acquisition of the grocery store is possible despite the execution of the Agreement to Purchase and Security Agreement on June 25, 1985, three days before the Corporation received its Certificate of Incorporation. Promoters who contract before the corporation is properly created are personally liable for those contracts. *See Robertson v. Levy*, 197 A.2d 443 (D.C.APP.1964). A deed delivered after the grantee company is incorporated is valid although dated a few days before incorporation. Fletcher, *supra*, § 3019, at 155. In contrast to *Robertson*, the Corporation was properly created before execution of the sale's critical instruments, notes, security agreements, and Independent Retailer Agreement and the Corporation's tendering 88% of the cash down amount. To banish the Corporation from consideration as the buyer, based on the execution of a couple documents shortly prior to incorporation, unjustly benefits Red Owl, who caused the acceleration of document execution when it accelerated the possession transfer of the store. Allowing Red Owl to benefit from the problem it caused would encourage creditors to violate the covenants of good faith and fair dealing, especially when dealing from a position of superior legal knowledge. U.C.C. § 1–203.

The execution of a few documents shortly before incorporation does not exclude the Corporation from consideration as the buyer, alternatively, because documents concerning closing the agreement name the buyer as "Dakota Country Foods Store." While Wagenman, Hoseck, and Jensen were named in the Agreement to Purchase, subsequent critical papers executed on the physical transfer date, June 30, 1985, named the buyer as "Dakota Country Store Foods." Documents, such as the Agree-

ment to Purchase, often serve as the basis for negotiations to successfully close the deal. Items needed settling from the time the initial promise-to-purchase documents were executed to the closing. If the Corporation was not the owner of the store under the Agreement to Purchase, it was not forbidden from acquiring it, since Red Owl itself prepared the paperwork transferring (assigning) the store to Dakota Country Foods Store on June 30, 1985, two days after the Corporation conclusively existed.

The technical rules commonly applied to public-issue corporations are not necessarily applied to close corporations. *First Nat. Bank of Beresford v. Nelson,* 323 N.W.2d 879, 885 (S.D.1982). The closely held corporation is not held to as strict formalities as is a large corporation. *Id.;* Fletcher, *supra,* § 3001, at 122. The sophistication of a party to a contract is a consideration in contract analysis. *See, e.g., Wolken v. Erck,* 421 N.W.2d 63, 66 (S.D.1988); *Hofer v. General Discount Corp.,* 86 S.D. 133, 145, 192 N.W.2d 718, 725 (1971). The Directors, none of whom were familiar with corporate formalities, are unsophisticated investors. The only services the Corporation's attorney provided were incorporation and overseeing one minutes meeting.

The harsh effect of the Directors' failure to comply with formal technicalities of corporate law, such as not abstaining from trying to contract on behalf of the Corporation, is softened by unsophistication, a lack of counsel representation, and size. The buyer executed all sale memoranda without the benefit of counsel. This situation resulted in the Directors' failure to adhere to various requirements of corporate law. The execution of a few documents prior to the issuance of the Certificate of Incorporation is not fatal to the Corporation's ownership claim. Red Owl itself did not perfectly adhere with the law because it never issued a bill of sale and never complied with the Bulk Sales Act. Now that preliminary issues questioning whether the Corporation may have entered into the transaction have been answered affirmatively, the substance of the sale's writings will be addressed.

### C. Sufficiency of Contract.

In determining the proper interpretation of a contract, the court must ascertain and give effect to the parties' intention. *Malcolm v. Malcolm,* 365 N.W.2d 863, 865 (S.D.1985). Interpretation of the bargain of the parties begins with the memoranda's express language. In determining the parties' intention, the court must look to the contract language used. *Id.* Each word and provision of a contract should be of significance which is consistent with, and will effectuate, the parties' manifest intention. *Jacobs,* 273 N.W.2d at 144. Express contract language is preferred over oral testimony which is subject to perjury. Farnsworth, *supra,* § 6.1, at 370. The importance of writings prompted the statute of frauds. Only if construction of an instrument as a whole leaves the intention of the parties in doubt, is consideration given to the situation and circumstances of the parties at the time of the execution in order to determine what was within their contemplation at the time of contracting. *Id.,* § 7.10, at 492.

The memoranda aptly identify Red Owl as a Delaware corporation, but no explanation exists as to what type entity Dakota Country Foods Store is. It is not apparent that this buying entity refers to the three Directors individually named in the first document signed. Language in a contract is ambiguous if genuine uncertainty exists as to which of two or more meanings is the proper one when the language is reasonably capable of being understood in more than one sense. *North River Ins. Co. v. Golden Rule Const., Inc.,* 296 N.W.2d 910, 913 (1980); *City of Sioux Falls v. Henry Carlson Co., Inc.,* 258 N.W.2d 676, 679 (S.D.1977). Dakota Country Foods Store may be understood as referring to the Corporation because the names are similar, Red Owl knew via the questionnaire and conversations with the Directors that the store would be operated as a corporation, and a Red Owl employee explained away a Director's inquiry as to the layout of memoranda by saying that's the way they came down from Red Owl (headquarters). On

the other hand, the Directors signed absent any corporate title. Dakota Country Foods Store could reasonably refer to the Corporation or to the three Directors individually. What or who is meant by designating the buyer as "Dakota Country Foods Store" in the Independent Retailer Agreement and other sale memoranda is therefore an ambiguity.

Any doubts arising from an ambiguity of language in a contract are resolved against the writer, who can, by exactness of expression, more easily prevent mistakes in meaning with whom he is dealing. *Enchanted World Doll Museum v. Buskohl*, 398 N.W.2d 149, 152 (S.D.1986). Red Owl prepared all sale memoranda. The ambiguity is construed against Red Owl so that the buyer of the grocery store is the Corporation.

Red Owl's questionnaire's usage of "operated as" intended to ferret out the buying entity. "Operate" is defined as to perform a function, an operation, or produce an effect. *Black's Law Dictionary* 984 (5th ed. 1979). The interpretation of "owner" depends on the significance upon connection for which it is used. *Loving Saviour Church v. United States*, 556 F.Supp. 688, 690 (D.S.D.1983), *aff'd*, 728 F.2d 1085, 1086 (8th Cir.1984). The memoranda's use of "operated as" means owns in light of the transaction, including a long-term lease and a franchise agreement, as well as the sale of inventory. "[O]perated as" incorporates ownership as lessee, franchisee, and chattel buyer. The questionnaire's listing of Wagenman as owner apparently refers to who would own the entity operating the store. Wagenman, as a shareholder, was part owner of the Corporation which operated the store. It cannot refer to Wagenman as a sole proprietor because Hoseck and Jensen signed all memoranda, as well as Wagenman, and no other sale document lists Wagenman alone. Red Owl was told of the Corporation. Corporate operation is a clear, written indication that the Corporation would own the independent retailer.

Information of corporate operation was distributed to Red Owl's top management and to over eighty different Red Owl employees. The memoranda's ambiguity cannot be construed in favor of its drafter, Red Owl, who was noticed at least once in writing that the Corporation would operate the grocery store. Red Owl itself suggested using a corporate entity. Red Owl's mishandling of the Corporation as to security interest perfection, because no security agreement was ever filed for the Corporation but properly utilized everywhere else, is not grounds to fault the Corporation for Red Owl's ambiguity. The reasonableness of construing Red Owl's buyer ambiguity to mean the Corporation is reinforced by the parties' intent found in parol rule evidence analysis.

D. Parol Evidence Rule.

The law favors using a writing by the parties as a final expression of an agreement over oral or other evidence. Writings are protected from extraneous attacks by safeguards, such as the parol evidence rule of U.C.C. Article 2–202. Article Two applies to chattel transactions. U.C.C. §§ 2–102, –105. The grocery store sale involved U.C.C. Article Two goods, such as inventory and fixtures, but the transaction's ongoing relationship concerned the Red Owl franchise. *See Hoffman v. Red Owl Stores, Inc.*, 26 Wis.2d 683, 133 N.W.2d 267 (1965). Article Two has been applied in matters tangentially or remote from goods, where it will preserve the parties' bargain and intent. *See Pet Dealers Ass'n of New Jersey, Inc. v. Division of Consumer Affairs*, 149 N.J.Super. 235, 373 A.2d 688 (1977); *Hoffman v. Horton*, 212 Va. 565, 186 S.E.2d 79 (1972); *Jandreau v. Sheesley Plumbing & Heating Co. Inc.: Applying U.C.C. Article Two to Hybrid Transactions*, 28 S.D.L.Rev. 448 (1983). While this is a hybrid transaction, it is appropriate to borrow Article Two's parol evidence rule in order to maintain the integrity of the bargain of the parties.

Intent must be gleaned from the plain, clear language of the contract, where possible. Justice Holmes urged caution in interpreting contract language because, "A word isn't a crystal, transparent and unchanged, it is the skin of a living thought

and may vary greatly in color and context according to the circumstances and the time in which it is used." *Towne v. Eisner*, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918). The parol evidence rule flexibly handles this situation by providing in pertinent part:

> Terms with respect to which the confirmatory memoranda of the parties agree or which otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented (a) by course of dealing or usage of trade (Section 1–205) or by course of performance (Section 2–208);
> . . . .

U.C.C. § 2–202. Limited parol evidence is admissible to explain the memoranda. This is in accord with the overall principle of contract interpretation, given the court's freedom to look at all relevant circumstances surrounding the sale transaction by which the parties manifested their assent. Farnsworth, *supra*, § 7.9, at 492. Parol evidence to explain, but not contradict, express writings is admissible since the court's concern is predominantly with the expectations the contract aroused in the parties. *See Seixas v. Woods*, 2 Caines 48 (N.Y.1804). Of the limited parol evidence admissible, course of performance and course of dealing are applicable, but not usage of trade because no evidence on usage was presented by the parties. This is in accord with the idea that agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish the meaning of the writing. *Restatement (Second) of Contracts* § 214 (1980).

Course of performance involves repeated occasions for performance in that any course of performance accepted to or acquiesced in shall be relevant to determine the meaning of the agreement. U.C.C. § 2–208(1). A course of actual performance is considered the best indication of what the parties intended the writing to mean. Official Comment 2 to U.C.C.

§ 2–202. Course of performance is conduct subsequent to the contract.

The course of performance between Red Owl and the Corporation during the year subsequent to the store sale establishes Red Owl sold its store to the Corporation. The most relevant acts were the Corporation's paying for the sale and Red Owl's acknowledging the Corporation was the Sioux Falls independent retailer. Red Owl debited the Corporation's bank account for at least $150,000 to pay for the sale. Red Owl knew this account was the depository for the independent retailer's earnings. In addition, Red Owl designated the Sioux Falls store owner as the Corporation to third parties and internally. The I.R.S., insurance, unemployment, and sales tax matters all name the Corporation. Red Owl produced weekly operating statements designating the Sioux Falls independent operator as the Corporation. Red Owl never voiced objection that the Corporation was not the buyer until after the repossession. Accordingly, for Red Owl to argue that it did not know that the independent retailer store in Sioux Falls was intended to be the Corporation is strained, at best, and fiction, at worst.

Red Owl's course of dealing with the Sioux Falls store indicates the store was sold to the Corporation. A course of dealing is defined as: "[A] sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting the expression of the parties." U.C.C. § 1–205(1). A course of dealing occurs when parties to an agreement dealt with each other previously. Farnsworth, *supra*, § 713, at 508. The 1985 sale memoranda listing the buyer as Wagenman, Hoseck, and Jensen cannot be a course of dealing because these three men, as a trio, never dealt together with Red Owl. However, a contract executed in 1986 indicates a course of dealing.

The 1985 summer store sale establishes a sequence of previous conduct which is fairly regarded as establishing a common basis of understanding between Red Owl and the Corporation. The sale memoranda, signed

by the Directors, which are central to the issue of whether the Corporation acquired the store, involved no course of dealing previous to the sale in 1985. However, a subsequently executed Training Incentive Planning Service Retailer Agreement, other documents, and correspondence establish a course of dealing. The Training Incentive Planning Service Retailer Agreement dated July 9, 1986, designates the store name as "Dakota Country Store Foods" and the buyer as "Dakota Country Store Foods, Inc." Director Jensen executed the document with nothing after his name. In addition, Red Owl accepted, without objection, documents, such as the reaffirmation notes, clearly indicating the Corporation. As few as two prior occasions of dealing may constitute a course of dealing. See *Nanakuli Paving & Rock Co. v. Shell Oil, Inc.*, 664 F.2d 772 (9th Cir.1981). Unambiguously contracting with the Corporation and accepting its notes and letters create a course of dealing between Red Owl and the Corporation. After performing the grocery store sales contract with the Corporation and then expressly dealing with the Corporation, Red Owl cannot act as the proverbial monkey who sees, speaks, and hears no evil.

E. Technical Errors.

Technical errors in executing documents on behalf of the Corporation are excusable because the parties intended the Sioux Falls independent retailer to be the Corporation. Bargained-for, vested legal rights are honored, but the Court has no intention of going back into the morass of nit-picking from which the U.C.C. refreshingly leads. *Sherman v. Upton*, 90 S.D. 467, 471, 242 N.W.2d 666, 670 (1976). The Court limits the waiver of technicalities to matters of significance between the two parties, but not to third parties who could not waive such. Any informality in executing a contract is waived and cannot be set up as a defense where a party accepted and retained benefits of the contract. Fletcher, *supra*, § 3011, at 144. Red Owl received at least $210,000, excluding the repossessed store, from the Corporation and carried the store for a long time because inter-

nal study found Red Owl profited by this arrangement. Significant execution errors in the memoranda include no corporate designation and Director signatures with nothing after their names.

Leaving off the word, "Inc.," to Dakota Country Store Foods amounts to excusable error given sale circumstances. A mistake in setting out the name of a corporation is not fatal where the corporation's identity is apparent. Fletcher, *supra*, § 3014, at 149. Leaving out "Inc." from a name on a sales contract may be considered a minor error where the contract was properly signed by an appropriate officer. *In re Excel Stores, Inc.*, 341 F.2d 961, 962 (2d Cir.1965). The fact that a corporate name was omitted from signed documents does not render them invalid where there is clear proof that the contracts were intended to be the obligation of the corporation and duly authorized. *In re Goldville Mfg. Co. of Goldville, S.C.*, 118 F. 892, 896 (D.C.S.C.1902). The lack of placing "incorporated," "corporation," or "company" after Dakota Country Store Foods is excusable error where both parties intended the Corporation to be the buyer, the Corporation acted without the benefit of counsel, the signers were Corporation Directors, and the Directors were unsophisticated in comparison to Red Owl's superior resources. The questionnaire clearly intends the independent operator to be a corporation.

The Directors thought they could execute documents as corporate agents without putting anything after their signatures. A signature with nothing else to notate the representative capacity signed in is prima facie proof of signing in an individual capacity. Fletcher, *supra*, § 3001, at 124. Overcoming the presumption of personal capacity is difficult. The Directors' subjective intent is insufficient by itself. Only extensive proof that both parties manifestly intended the Corporation to purchase the store, the similarity in names on the memoranda, and the buyer's not having counsel present during document execution overcome the heavy presumption. The strongest evidence of intent, the course of performance, is shown by Red Owl's own ac-

tions of using the Corporation's bank account to pay for the sale, Red Owl's declaration to third parties, and Red Owl's internal documents naming the Corporation as store owner.

Official capacity as a corporate agent may exist where the corporate title is inadvertently left off. *Kenneally v. First Nat. Bank of Anoka*, 400 F.2d 838, 841 (8th Cir.1968), *cert. denied*, 393 U.S. 1063, 89 S.Ct. 716, 21 L.Ed.2d 706 (1969); *Sherman*, 242 N.W.2d at 670. A signature is anything intended. *See S.W. Engineering Co. v. Martin Tractor Co.*, 205 Kan. 684, 473 P.2d 18 (1970). A complete signature is not required to contract. U.C.C. Official Comment 39 to § 1–201(39). In *Kenneally*, the secretary of a corporation signed an instrument inadvertently omitting her title. The court inferred from the circumstances that the secretary could have signed the note in her official capacity. *Kenneally*, 400 F.2d at 841. The Corporation's agents' inadvertent failure to denote corporate capacity is excusable based on unique circumstances.

Presumably, the president of a corporation, who is active in its management, has authority to do and perform acts necessary to conduct business of the corporation. *Aimonetto*, 80 S.D. at 458, 126 N.W.2d at 119. The Directors were all active in management of the Corporation, which operated the independent retailer. A corporation may adopt its agent's action by ratification or acquiescence. *Contract Materials Co. v. Oahe Land & Cattle Co. Inc.*, 374 N.W.2d 102, 104 (S.D.1985). The Corporation acquiesced to the sale, as evidenced by operating the business, representing to various trades payable creditors that the Corporation ran the independent retailer, authorizing a bank account where the store's revenues were deposited, and making payments on the sale contract.

F. Estoppel.

■ Red Owl is estopped from denying it contracted with the Corporation. When a corporation acts within the general scope of its powers, the corporation, as well as persons contracting with it, may be estopped to deny that they complied with the legal formalities which are prerequisites to their existence or to their actions where such requisites are complied with and the corporate identity is known. *See Louisville, N.A. & C.R. Co. v. Louisville Trust Co.*, 174 U.S. 552, 19 S.Ct. 817, 43 L.Ed. 1081 (1898); *Lettinga v. Agristor Credit Corp.*, 686 F.2d 442, 446 (6th Cir.1982); *Cranson v. I.B.M.*, 234 Md. 477, 200 A.2d 33 (1964). *Engler v. Ipswich Printing Co.*, 63 S.D. 1, 4, 256 N.W. 132, 134 (1934). The June 27, 1985, questionnaire informed Red Owl it entered the sale and franchise agreement with the Corporation.

South Dakota employs estoppel, based on actual knowledge of the parties, in deciding whether a party is bound to a contract. *Schubloom v. Donavon & Assoc., Inc.*, 90 S.D. 413, 415, 241 N.W.2d 710, 712 (1976); *Rust–Owen Lumber Co. v. Wellman*, 10 S.D. 122, 125, 72 N.W. 89, 90–91 (1897). In *Schubloom*, a supplier contracting to furnish glass to Donavon and Associates, who was ignorant that Donavon was a corporation, did not lose his claim despite deficiencies from not pursuing his claim against the corporation properly. *Schubloom*, 90 S.D. at 415, 241 N.W.2d at 712. Even the placing of the word, "company," after a corporate name did not serve as conclusive evidence that the contracting party was held to know the contracted party was a corporation. *Wellman*, 10 S.D. at 125, 72 N.W. at 91. *Schubloom* and *Wellman*, standing for the proposition that a contracting party is bound by its actual knowledge, estop Red Owl from complaining about the Corporation it knowingly sold to.

Based on the intent of the parties when the sales memoranda were signed, the ambiguity, the course of performance, and the course of dealing, the Corporation acquired the Sioux Falls grocery store. As late as thirty-four days before the repossession, Red Owl clearly contracted with the Corporation by a contract indicating the buyer as "Dakota Country Store Foods, Inc." The Corporation, having never alienated its interest in the grocery store, owned the grocery store when repossessed by Red Owl on August 12, 1986.

## II.

### A. Creditor Status.

The instant matter is a struggle between creditors. Red Owl contends its security interest is perfected. The Trustee, representing the interests of all unsecured creditors, insists Red Owl never perfected by filing and the repossession is a voidable preference, thus, inferior to the position of the Trustee.

The Trustee is given the position of a hypothetical judicial lienholder on all property of the debtor on which a creditor on a simple contract could have obtained a judicial lien. 11 U.S.C. § 544(a)(1); *In re Corsica Enterprises, Inc.*, 40 B.R. 769, 771 (Bankr.D.S.D.1984). State law determines perfection. *In re Hogg*, 76 B.R. 735, 744 (Bankr.D.S.D.1987). The Trustee, as a lien creditor, takes priority over an unperfected security interest. U.C.C. § 9–301(3); *Corsica*, 40 B.R. at 772. The primary aspect of the hypothetical lien creditor is to invalidate transfers which were incomplete at filing, especially with regard to filing or recording acts. *First Nat. Bank of Denver v. Turley*, 17 B.R. 99, 102 (Bankr.D.S.D.1981), *aff'd*, 705 F.2d 1024, 1027 (8th Cir.1983).

Depending on the collateral, a creditor may perfect its security interest in three ways: filing a financing statement, taking possession, or by automatic perfection. U.C.C. §§ 9–203, –302 through –306. Automatic perfection is inapplicable to the matter at hand. However, Red Owl did attempt perfection by filing a financing statement and taking possession.

### B. Perfection by Filing.

To perfect by filing, a financing statement must be filed under the debtor's name. U.C.C. § 9–402(1); *Sherman*, 242 N.W.2d at 669. Red Owl filed financing statements only under the names of "Red Owl Store(s) (Inc.)" and the names of the individual Directors. Substantial compliance with the few formal requisites of a financing statement is effective despite minor errors which are not seriously misleading. *See, e.g., In re Nara Non Foods Distributing, Inc.*, 66 Misc.2d 779, 322 N.Y.S.2d 194 (1970), *aff'd*, 36 A.D.2d 796, 320 N.Y.S.2d 1014 (1971) ("Nara Dist., Inc.," valid); *In re Gibson's Discount Pharmacy of Bristol, Tennessee, Inc.*, 15 U.C.C.Rep. 233 (Bankr.E.D.Tenn.1974) ("Gibco Discount Drugs, Inc.," valid). An error is seriously misleading if a reasonable researcher would not find the financing statement or would not be put on notice to inquire elsewhere about it. *In re McGovern Auto Specialty, Inc.*, 51 B.R. 511, 513 (Bankr.E.D.Pa.1985). The bankruptcy trustee is not required to prove that an actual search failed to uncover the financing statement under consideration. *In re Brawn*, 6 U.C.C.Rep. 1031, 1041 (D.Md. 1969).

The general rule is that a security interest is not perfected by a filed financing statement which, through some fault of the secured party, does not give notice. *In re D.G. & Assoc., Inc.*, 9 B.R. 94, 96 (Bankr.E. D.Tenn.1981). The filing officer uses the debtor's name to compose his index of the financing statement, and subsequent parties use the index in order to find the filing. U.C.C. § 9–403(4). If the debtor's name is wrong, the index is wrong, and subsequent parties are misled. An unlocatable financing statement is worthless because of its failure to achieve its basic purpose of providing enough information to alert an interested party of a possible prior security interest in that collateral, regardless of the good faith intent of the filing creditor. *In re Terry Pierson, Inc.*, 84 B.R. 533, 536 (Bankr.S.D.Ill.1988); *In re Rhine*, 22 B.R. 42, 43 (Bankr.D.S.D.1982).

Whether a filed financing statement is seriously misleading and, therefore, ineffective to perfect the creditor's interest in the collateral is determined by the facts of each case. *In re Vital Breathing Products, Inc.*, 98 B.R. 97, 100 (Bankr.N.D.Ga. 1988). Courts excusing a name error as not misleading include situations where the names are similar, filing is under a trade name, or there is a slight misspelling. *See, e.g., In re Glasco*, 642 F.2d 793, 796 (5th Cir.1981) (trade name filing valid); *In re Radtke Heating & Sheet Metal Co., Inc.*, 95 B.R. 84 (Bankr.N.D.Ill.1989) (omitting

"incorporated" from name valid); *In re Strickland*, 94 B.R. 898 (Bankr.N.D.Miss. 1988) (incorporating debtor's correct last name valid). Filing under "Red Owl Store" is insufficient because a reasonable researcher would not connect it to the Corporation. Red Owl's ownership of the trade name, "Country Foods," fails to notice creditors to search under Red Owl. Filing a financing statement in the names of corporate officers is insufficient to perfect a security interest in property of the corporation. *In re Sportswear Shoppe, Ltd*, 15 B.R. 970, 975 (Bankr.W.D.Mo.1981). The filing search prompted in the management . buy-out of Red Owl failed to find any filings under the Corporation or anything close to it. Red Owl's financing statements are so seriously misleading as to be unlocatable by a reasonable researcher. Red Owl is not a perfected creditor by filing because it failed to file an adequate financing statement. Red Owl, absent the repossession, is an unsecured creditor.

### C. Perfection by Possession.

A security interest in goods may be perfected by taking possession of the collateral. U.C.C. § 9–305. Red Owl took possession of the store, everything therein, the Corporation's bank account, and intangibles when the repossession papers were executed and the Corporation's bank account was debited on August 12, 1986. Red Owl became a perfected secured creditor by repossessing the grocery store eighty-seven days prior to the Corporation's filing its bankruptcy petition. The Trustee's hypothetical lien creditor status under Section 544 is subordinate to Red Owl's secured position by possession of the collateral.

### D. Preferences.

■ The Trustee assails Red Owl's secured creditor status and repossession as a voidable preference. While Section 544 implements state law policies, Section 547 establishes a policy to preserve pre-bankruptcy transfers that benefit particular creditors over others of similar status. H.R. Rep. No. 595, 95th Cong., 1st Sess., *reprinted in* 1978 U.S.Code Cong. & Admin.

News 5787, 5963, 6138. A voidable preference under Section 547(b) requires the following conditions:

(1) a transfer of the debtor's property;

(2) to or for a creditor's benefit;

(3) for an antecedent debt owed by the debtor before the transfer was made;

(4) made while the debtor was insolvent;

(5) made within 90 days prior to the date of filing the petition (one year if insider); and

(6) the transfer enables the creditor to receive more than if the case were a Chapter 7 liquidation case.

*Hogg*, 76 B.R. at 735. The Trustee shoulders the burden of proving the voidability of a transfer. 11 U.S.C. § 547(g).

A creditor's improvement in status from unsecured to secured is a transfer. A transfer includes voluntary and involuntary transfers. 11 U.S.C. § 101(50); *In re Hines*, 3 B.R. 370, 372 (Bankr.D.S.D.1980). Perfecting by possession, as well as actually transferring the store to Red Owl, constitutes a transfer, although they are tied together in that possession resulted in perfection of the security interest. Creditor Red Owl benefited by the repossession because it received assets such as goods, cash, the leasehold, and intangibles. The repossession gave Red Owl perfection and collateral.

Red Owl's strongest colorable argument to negate Section 547(b)'s application is the antecedent debt requirement. Antecedent debt is generally understood to mean that the obligation being paid or secured by the transfer existed prior to the time the transfer was made. Red Owl argues goods delivered to the Corporation before the repossession constitute new value contemporaneously given under Section 547(c)(1). *In re Northwest Erection, Inc.*, 56 B.R. 612, 614 (Bankr.D.Mont.1986). However, the repossession lacks new value because the Corporation capitulated the entire store with no new consideration given in exchange.

Contemporaneous intent in the reciprocating transfers is a central element required by Section 547(c)(1). *In re Arnett*,

731 F.2d 358, 362 (6th Cir.1984). Not only need Red Owl supply some goods of value to the Corporation shortly before the repossession, but intent is also required. Intent presupposes knowledge. *See Reinhard v. Lawrence Warehouse Co.*, 41 Cal.App.2d 741, 107 P.2d 501 (1940). The Directors, surprised by the presentation of the repossession papers on August 12, 1986, lacked the requisite intent for a contemporaneous exchange because they were ignorant of the repossession when the goods were received earlier. A debtor's repayment of an unsecured loan made to him earlier on the same day is potentially preferential. *Nat. City Bank of New York v. Hotchkiss*, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913). While the Corporation received deliveries shortly prior to the repossession, this could not be a contemporaneous exchange under Section 547(c)(1) because intent is missing. Surrendering an entire enterprise is not in the ordinary course of business because business operations would then terminate. 11 U.S.C. § 547(c)(2).

The Corporation's insolvency is the easiest Section 547(b) element the Trustee must prove. The store became insolvent after the first month's operating losses consumed the Corporation's initial $40,000 capital investment. The 403 Ledger account discloses the Corporation's debt to Red Owl totaled several hundred thousand dollars on the date of repossession, which did not include unpaid taxes. While not necessary in view of the facts, Section 547(f) presumes a debtor is insolvent ninety days prior to the bankruptcy petition filing. Repossession occurred eighty-seven days prior to filing the petition.

Red Owl received more than in a liquidation bankruptcy because it did not have to share with the class of unsecured creditors which it would have if it had remained an unsecured creditor. As the only secured creditor, Red Owl hoarded all assets of the Corporation.

The Trustee, having proven all six elements requisite to a Section 547(b) preference, may void the entire transfer of the grocery store to Red Owl. The transfer of secured status, by perfection and the repos-

session of collateral, is dislodged. Red Owl becomes an unsecured creditor.

### E. Preference Valuation.

The Trustee recovers the value of the property, recovered under Section 547(b), from the initial transferee of the store, Red Owl. 11 U.S.C. § 550(a). Red Owl must turn the value of the preference over to the Trustee since the actual collateral has been dissipated. The Trustee shall preserve this money for the benefit of the estate. 11 U.S.C. § 551.

A bankruptcy court must give specific reasons for its choice of valuation method. *See In re Missionary Baptist Foundation of America, Inc.*, 796 F.2d 752 (5th Cir. 1986). Red Owl-set values, as modified, are persuasive, as they are based on feasible going concern values rather than liquidation values. The value of a going concern is greater than a business sold in pieces on the auction block. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).

Red Owl's valuation contains some objectivity, credibility, and relevance. Red Owl's valuation of accounts appears not to be manufactured for trial, in that it was computed months before bankruptcy was filed and tends to favor the Corporation. A third party inventoried the grocery store. Any discrepancies are minor and constitute a wash, such as valuing fixed assets at a low historic cost less depreciation, versus valuing other assets at a set amount per square foot, which is generous considering the consistently unprofitable store could not have a great value. On the other hand, Red Owl kept the store open after the repossession. Red Owl's valuation of the preference, as modified, is the amount that would be obtained by the most commercially reasonable disposition under these circumstances. *In re American Kitchen Foods, Inc.*, 2 Bankr.Ct.Dec. 715, 719–20 (Bankr.N.D.Me.1976).

Red Owl's assigned values of repossessed assets are acceptable, with the addition of the $20,000 Red Owl drained from the Corporation's bank account on August 12, 1986. The preference's value is $630,-

173 (consisting of inventory $410,641; supplies at $8,706; change fund $5,475; accounts receivable $14,802; postage stamps $33; fixed assets $170,516; and bank-taking $20,000). Red Owl, disgorged of its preference, is an unsecured creditor.

### III.

#### A. Equitable Subordination.

It is well settled that a bankruptcy court may subordinate a creditor's claim under the proper circumstances. *In re Sepco, Inc.*, 36 B.R. 279, 287 (Bankr.D.S.D.1984), *aff'd*, 750 F.2d 51, 53 (8th Cir.1984); *Kapp v. Naturelle, Inc.*, 611 F.2d 703, 708 (8th Cir.1979). Red Owl's control of the Corporation and debiting raises the issue of equitable subordination.

■ The inherent power of the bankruptcy court to subordinate claims on fairness grounds, as established in cases such as *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), is codified in Section 510(c). Equitable subordination allows the court to: "... (1) ..., subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate." 11 U.S.C. § 510(c). Three questions must be answered affirmatively in order to equitably subordinate Red Owl's claim under Section 510(c): (1) Red Owl must have engaged in some form of inequitable conduct; (2) the misconduct must have unfairly benefited Red Owl vis-a-vis other creditors; and (3) equitable subordination must not be inconsistent with other provisions of the Bankruptcy Code. *In re Clark Pipe & Supply Co., Inc.*, 870 F.2d 1022, 1027 (5th Cir.1989); *In re Bellanca Aircraft Corp.*, 850 F.2d 1275, 1282 (8th Cir.1988); *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir.1977); *Sepco*, 36 B.R. at 287.

#### B. Bad Conduct.

■ Three general categories of conduct are recognized as sufficient to satisfy the first prong of Section 510(c): (1) fraud, breach of fiduciary duties or illegality; (2) undercapitalization; and (3) a claimant's use of the debtor as an alter ego or a mere instrumentality. *Clark*, 870 F.2d at 1027. Only one item is required, and Red Owl's control by not permitting S & H Green Stamps and directing which creditors received payment is most pertinent.

Red Owl directed the Corporation to string out trades payable creditors under threat of cutting off credit and taking back the store. The Corporation, with no other source of credit, caved in to Red Owl's demands. Red Owl ordered the Corporation to not pay trades payable timely, telling them a Red Owl loan was coming soon. Trades payable went unpaid, unaware Red Owl was draining the Corporation's cash through debits. Payment to Red Owl at the expense of trades payable apparently was contemplated from the beginning, since the store's revenues deposited in the account were projected to have originated seventy-five to eighty percent from the trades payable. Red Owl, knowing the Sioux Falls grocery store consistently lost money and the dismal financial status of the thinly capitalized Corporation, ensured it was paid first.

Red Owl used its debit power and deferred payment to trades payable not merely to protect its investment, but to leverage its recovery at the expense of other creditors. A creditor's use of the debtor as an instrumentality is sufficient conduct to satisfy the bad conduct prong of the three-part equitable subordination test. *Clark*, 870 F.2d at 1030–31. Red Owl's inequitable behavior establishes a breach of the multitude of rules of fair play and good conscience, including overreaching. *Pepper v. Litton*, 308 U.S. at 310, 60 S.Ct. at 247. Red Owl's egregious behavior, excluding the repossession, meets the first test of Section 510(c).

#### C. Red Owl's Benefit.

The second prong of Section 510(c) requires the inequitable conduct to have injured other creditors or conferred an unfair advantage to the claimant. Equitable sub-

ordination is appropriate where there is fraud or there are insiders acting in a manner which undermines other creditors' rights. *See Levit v. Ingersoll Rand Financial Corp.*, 874 F.2d 1186 (7th Cir. 1989). *BankWest, Inc. v. United States*, 102 B.R. 738, 741 (D.S.D.1989). Red Owl's control of the Corporation, with privity of its financial situation, renders it an insider. 11 U.S.C. § 101(30)(B)(iii).

Both Red Owl and the trades payable provided the Corporation with inventory. Both were entitled to payment. Revenues from trades payable, as well as from goods supplied by Red Owl, were commingled in the Corporation's bank account. Red Owl used this bank account to pay at least $150,000 on the sale contract. It is reasonable to assume that, had the trades payable known Red Owl was draining the Corporation's cash and that the soon-to-be-given loan was a ploy to extend payment and credit, they would have exercised their vendors' privileges in order to protect their interests. The repossession not considered, Red Owl's inequitable conduct over the span of over a year gave it the unfair advantage of receiving at least $150,000 vis-a-vis the trades payable. While at least some of these transfers may qualify as a preference, tracing the funds in this convoluted relationship is uncertain, and Red Owl's insidious conduct warrants subordination.

### D. Consistency with other Bankruptcy Code Sections.

The last item Section 510(c) requires is that equitable subordination not be inconsistent with another part of the Bankruptcy Code. *Sepco*, 36 B.R. at 280. Red Owl's failure to perfect its security interest through filing is not inconsistent with equitable subordination because Red Owl's inequitable conduct did not enter into the state law determination of filing by perfection. The next consistency question is whether avoiding the transfer pursuant to Section 547(b) and equitable subordination are duplicative or complementary.

The avoidance of the preferential transfer of the repossession returned to the Trustee, the amount Red Owl improved its position by at the cost of other creditors. Avoidance of the preference fails to remedy the benefit Red Owl received by stringing along trades payable while debiting the Corporation's account. Without equitable subordination, Red Owl and trades payable, as unsecured creditors, are entitled to equally share in the Corporation's assets. Red Owl comes out ahead if it is not sanctioned for the $150,000 or more it gained by inequitable conduct.

Permitting avoidance of the preference and equitable subordination attains a choate remedy and fair division of assets. Equitable subordination is useful in a situation to prevent the consummation of a course of conduct which is inequitable and to undo unfairness. *Clark*, 870 F.2d at 1031 (quoting *Heiser v. Woodruff*, 327 U.S. 726, 733, 66 S.Ct. 853, 856, 90 L.Ed. 970 (1946); *In re Kansas City Journal–Post Co.*, 144 F.2d 791, 800 (8th Cir.1944)). Both remedies must be employed to assure genuine relief to the trades payable. The entire claim of Red Owl must be subordinated to the unsecured creditors' claims. Punitive damages are unnecessary in light of the subordination of Red Owl's unsecured claim.

### CONCLUSION

The Court holds the Corporation acquired the grocery store Red Owl sold in the Summer of 1985. The Corporation owned the property when the peaceful repossession occurred August 12, 1986. Red Owl was never a secured creditor through filing, and its perfection by possession constitutes a voidable transfer. Red Owl, as an unsecured creditor, must tender the preference value, $630,173, to the Trustee. Moreover, Red Owl's use of the Corporation as its mere instrumentality, to ensure Red Owl be paid to the detriment of other unsecured creditors, requires equitable subordination. Red Owl's claim is subordinated to all other unsecured creditors' claims. Counsel for the Trustee is directed to submit an order and judgment consistent with this decision.